In re OLDE FLORIDA
INVESTMENTS,
LTD., Debtor.

Olde Florida Investments,
Ltd., Plaintiff,

v.

Port of the Islands Community Improvement District, Arthur R. Piper, Charles J. Alaimo, Collier County Tax Collector, First Union National Bank, as Custodian for Fundco, Inc., First Union National Bank, as Custodian for HOLDCO, Inc., First Union National Bank, As Custodian for Direct Lien Funding Co., Heartwood '88, Inc., Leon McCaskey, Nellie Kirby, Robert L. Hill, and Rose Marie Desimone and the State of Florida, Department of Revenue, et al., Defendants.

Bankruptcy No. 01–5321–9P1.
Adversary No. 01–213.

United States Bankruptcy Court,
M.D. Florida,
Fort Myers Division.

May 2, 2003.

Louis X. Amato, Louis X. Amato, P.A., Naples, FL, for debtor.

Andrew I. Solis, Naples, FL, for movant.

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

This is a yet to be confirmed Chapter 11 case. The matters under consideration are the issues raised by Olde Florida Investments, Inc. (Debtor) in its Second Amended Complaint (Doc. No. 66), filed against Defendants, Port of the Islands Community Improvement District (CID); Arthur R. Piper, Charles J. Alaimo, Collier County Tax Collector (Tax Collector); First Union National Bank, as Custodian for Fundco, Inc.; First Union National Bank, as Custodian for HOLDCO, Inc.; First Union National Bank, as Custodian for Direct Lien Funding Co.; Heartwood '88, Inc.; Leon McCaskey; Nellie Kirby; Robert L. Hill; Rose Marie Desimone; the State of Florida, Department of Revenue; and over more than 800 owners of property located within the CID.

In Count I of the Second Amended Complaint, the Debtor seeks a determination pursuant to 11 U.S.C. § 505 that the taxes assessed against the property of the Debtor by the CID are invalid. In Count II of the Second Amended Complaint, the Debtor seeks a determination pursuant to 28 U.S.C. § 157(b)(2)(K) of the validity, priority and the extent of tax liens based on the tax certificates sold by the Tax Collector encumbering the Debtor's property.

On May 23, 2001, Allstate Insurance Company (Allstate), who assumed all of the bonds issued by the CID in 1990, filed a Motion to Intervene (Doc. No. 35). On June 25, 2001, this Court entered an Order and granted the Motion to Intervene (Doc. No. 46). In due course, some homeowners filed their respective Answers, and several defaulted. Although this adversary proceeding was initially initiated on April 9, 2001, the Second Amended Complaint, filed by the Debtor on February 21, 2002, finally framed the pleadings. After disposition of several motions, including Motions for Summary Judgment, all of which were denied, the matter was set down for Final Evidentiary Hearing.

Out of almost one thousand litigants, only the following parties appeared at the trial. Louis X. Amato and Louis D'Agostino represented the Debtor. Gregory T. Stewart and Maureen Daughton represented Allstate. Daniel H. Cox represented the CID. Stephanie Carr represented the Tax Collector and Rosemary Desimone, Leon McCaskey and Robert Hill (Tax Certificate Holders). Andrew I. Solis represented several homeowners; Drew M. Dillworth for Hartwood '88; and Richard Zaretsky for First Union Bank, HOLDCO, Inc. and Fundco, Inc. However, the only parties actively participating in the trial were attorneys for the Debtor, Allstate, the CID, the Tax Collector, and the Tax Certificate Holders.

Having heard the testimony of witnesses, considered the Joint Stipulation as to Facts, submitted at the beginning of the trial, the documentary evidence offered and admitted into evidence, and the post-trial submissions of the parties, this Court makes the following findings of fact and conclusions of law.

## OWNERSHIP HISTORY OF THE PROPERTY

The Port of the Islands is a tract of land consisting of approximately 500 acres (Property). It is located approximately fifteen miles southeast of downtown Naples and is on both the north and south side of Highway U.S. 41. The Property is generally described as two parcels the "south side" and the "north side" of U.S. 41. As depicted on site plans and maps, U.S. 41 and the Fahka Union Canal naturally divide the Property. The property on the south side of U.S. 41 is located six miles from the Gulf of Mexico and has direct access to the Gulf by a waterway. The property on the north side of U.S. 41 does not have any access to the Gulf as a result of a weir system and the U.S. 41 bridge overpass. (Jt.Ex. 49).

The Property was developed in the mid–60's as Remuda Ranch. Remuda Ranch was initially designed to be a single-family platted development by GAC Properties, Inc. (GAC), a subsidiary of Gulf American Corporation. However, when the Property was acquired by Port of the Islands, Inc. (Developer), at the bankruptcy auction of the estate of GAC, the original development on the south side consisted only of a hotel, convention and recreational facilities, a canal system, lots, and an airstrip. A second hotel was added, along with an RV Park and a gun club. At that time, there were no single-family homes. (Jt.Ex. 49).

The Developer was a wholly owned subsidiary of International Bay Clubs, Inc. Mr. Ray, the principal of the Developer, began to develop home sites on the southwest side of the Property known as Morning Star Cay and Newport Cay. There were approximately forty home sites developed. The Developer also managed the Property. According to the plan development, there were plans to develop on the north side of the Property additional single and multi-family homes and to expand the RV Park. (Ex. G to Jt. Ex. 49). As more fully described below, the Debtor purchased a portion of the north side of the Property, which is the subject of this litigation.

## COMMUNITY IMPROVEMENT DISTRICT

The Port of Islands Community Improvement District, previously defined as CID, is a Community Development District, created by Chapter 190 of the Florida Statutes. It consists of a parcel of land approximately 486 acres, as resolved by Collier County Ordinance 86-64, effective September 22, 1986. (Jt. Stip. ¶ 1; Jt. Ex. 1). The CID has authority pursuant to Sections 190.006–190.041 of the Florida Statutes to manage, finance, fund, plan, establish, acquire, construct or reconstruct, enlarge or extend, equip, operate, maintain systems, *inter alia*, roads, roadway improvements, drainage systems, water treatment and wastewater facilities, irrigation systems and fire protection infrastructure. (Jt. Stip. ¶ s 2–3).

The CID also has the power and the authority to borrow funds through the issuance of bonds and to pledge the revenue to be derived from special assessments as a source of repayment for the bonds, pursuant to Sections 190.011(4), (9) and 190.016(8)(a) of the Florida Statutes. (Jt.Stip. ¶ 4). The CID has the power and

the authority to determine, order and levy annual installments of the total "Benefit Special Assessment" for bonds issued and related expenses to finance the district facilities and projects. In addition, the CID has the power and authority to determine, order, and levy a "Maintenance Special Assessment" to maintain and service the facilities in the project of the district. (Jt. Stip. ¶ s 5–6).

These assessments have a first priority lien on the property until the obligation is paid. It is enforceable in like manner as a state, county, municipal, or school board tax. *Fla. Stat.* § 190.021(3). Both the benefit special assessments and the maintenance special assessments are non-ad valorem assessments. As such, they may be collected at the CID's discretion by the tax collector pursuant to Section 197.363 or Section 197.3632 of the Florida Statutes, or in accordance with other collection measures as provided for by law. (Jt.Stip. ¶ 8).

Each year, the Board of Supervisors of the CID levies three separate non-ad valorem special assessments against the properties within the CID: One for debt service, one for operation and maintenance, and the other for capacity reserve. The operation and maintenance assessment is designed to fund the day-to-day operations of the CID. The capacity reserve assessment is designed to fund the fixed costs for the operation of the CID's potable water treatment plant and the wastewater treatment facility. (Jt. Stip. ¶ s 10–12).

## 1990 BOND AND DEBT SERVICE ASSESSMENTS

On October 25, 1990, the CID issued its Special Assessment Bonds, Series 1990 (Bonds), in the total amount of $7 million, pursuant to Resolution 90–10, adopted by the Board of Supervisors of CID and the Trust Indenture, dated October 1, 1990

between the CID and the First Union National Bank of Florida. (Jt. Ex. 12; Jt. Ex. 56). The Bonds were issued and subsequently sold to Allstate to retire certain existing notes representing indebtedness for funds borrowed by the CID for certain constructed improvements and to construct various water, wastewater, and road improvements, which specially benefited the Property within the CID. (Jt. Stip. ¶s 20–22). The repayment of the Bonds are secured by the pledged revenues, as described in the Trust Indenture, which include the revenues from the special assessments levied by the CID against the benefited properties.

Allstate remains the beneficial owner of 100 percent of the outstanding Bonds. The proceeds of the Special Assessments (Debt Service Assessments), are the primary source of the repayment of the Bonds. The CID is contractually obligated pursuant to section 9.03 of the Trust Indenture to collect the total debt of the Bonds.

In 1990, the Debt Service Assessments apportioned the total bond debt among the benefited real properties within the CID. The improvements acquired from the Developer included a north and south side interim sewer treatment plant, an interim water plant, some roads on the north side of the Property, and various roadways on the south side of the Property. The Debt Service Assessments also funded the construction of the extension of the water and wastewater lines to the remaining properties, the extension improvements of the roadway system in the CID, and a construction of a larger and more environmentally safe water and wastewater treatment facility. (Jt.Ex. 6). It is without dispute that the construction of fire and irrigation lines were not completed and made available for use until the summer of 2002.

In preparing the original Debt Service Assessments in 1990, the CID utilized a schedule identifying each parcel of land within the CID by Roman Numerals I–XIV. (Jt.Ex. 69). The parcels of the Property north of U.S. 41 and east of Fahka Union Canal consisted of Parcels XI, XII and XIV. Parcel XII is a wetland area not subject to development and Parcel XIV is a non-operating hotel complex. Parcel XI is the remainder of that portion of the Property within the CID, lying north of U.S. 41 and east of Fahka Union Canal and consists of 142.76 acres. (Jt.Stip. ¶ 23).

A portion of this parcel, Parcel XI, was subsequently acquired by the Debtor and is referred to as the "Debtor's Property." The Debtor's Property is located north of U.S. 41, is unplatted and has an RV resort and a gun club. It operates 99 RV sites, primarily during tourist season.

In 1990, the CID used a two-step approach for servicing the Debt Service Assessments. First, it prepared a development plan for the various parcels within the CID. Second, it allocated the cost of each component of the system and apportioned the costs only to those parcels, which utilized that portion of the system. It was not a system wide assessment; instead, it was a method in which only the portion of the costs of the improvements, which actually served a particular property, was assessed on the particular property. (Jt. Ex. 2, 10, 12, and 56).

As a result of the apportionment, based on this methodology, Parcel XI, which subsequently included the Debtor's Property was assessed $936,870 of the debt, or 13.4 % of the total indebtedness. (Jt.Stip. ¶ 24). Accordingly, in 1990, the CID assessed Parcel XI with respect to five of the seven original planned capital improvement projects.

It is without dispute that prior to 1993, no determination had been made that the 1990 assessment was irregular or defective, nor was there any finding that the 1990 assessment made by CID against Parcel XI was improper or illegal. Moreover, there has been no judicial determination that the 1990 assessment was in violation of the law, invalid or unenforceable.

### THE 1993 RE-ASSESSMENT

During this time, it is without dispute that in 1990, the Developer owned the majority of the Property. Thomas Barnard was chairman of the Board of Supervisors of CID, served as a representative of the Developer, and also was a real estate broker for the Port of the Islands Realty, Inc. (Port Realty). Port Realty was involved in marketing the properties located within the CID on the south side of U.S. 41. In December 1991, Mr. Ray the principal of the Developer passed away. The successor representative of the Developer decided to liquidate rather than further develop the properties within the CID.

Beginning in July 1992, the CID considered modifications to the 1990 Assessment and the construction program funded by the Bonds and initially adopted Resolution 92–5. (Jt.Stip.¶24). Resolution 92–5 provided for optional early payment and amended the estimated costs of construction. (Jt.Ex. 16). Ultimately, on January 21, 1993, the Board of Supervisors adopted Resolution 93–3, which amended and supplemented Resolution 90–07. (Jt.Ex. 22).

The minutes of the CID board meeting held on December 17, 1992, leaves no doubt that the proposed reassessment was contemplated to assure that the property owned by the Developer would receive a higher assessment with the reallocation. (Jt.Ex. 50). The minutes reflecting the Board Meeting on January 21, 1993, equally leaves no doubt that the purpose of the reassessment was to take a majority of the assessments from the south side property and move it to the north side, at that time owned by the Developer because the Developer, itself requested the reallocation. (Jt.Ex. 51).

The revised methodology for the reassessment contained three significant changes over the methodology used in 1990. First, the CID reevaluated the development potential of the various properties within the CID. Second, an allocation methodology based on equivalent residential connection (ERC) was implemented and utilized. ERCs are a measure of capacity with 1 ERC equivalent to 1 single family residence; .8 ERC equivalent to multi-family residence; .4 ERC equivalent to an RV site; and .6 ERC equivalent to a hotel room. (Jt.Stip. ¶ 16). Third, the cost of some of the acquisitions and improvements were allocated to all parcels throughout the CID, whether developed or not on a system wide basis rather than the direct benefit approach used in 1990.

As referenced above, the methodology used to allocate the cost for the special assessment, based upon the type of development being contemplated, is known as ERC. For the Operation and Maintenance Assessments, there were a total of 1059 Maintenance ERCs; for the Capacity Reserve Assessments, there were a total of 1032 Utility ERCs; and for the Debt Service Assessments, there were a total of 1022 Debt Service ERCs. (Jt. Stip. ¶s 11–13).

It is without dispute that the change substantially increased the amount of the cost of the improvements that had been either acquired or constructed to Parcel XI. Specifically, the CID made a determination that nineteen out of the twenty-three proposed projects benefited Parcel XI.

As a result of the reassessment, Parcel XI was allocated $2,178,710.80 of the bond debt, or 31.1% of the total indebtedness. With respect to the ERCs, Parcel XI was allocated 342 maintenance ERCs (32.3 % of the total); 300 capacity reserve ERCs (29% of the total); and 342 debt service ERCs (33.4% of the total), or a total of 984 ERCs. (Jt.Stip. ¶ 32).

In December of 1994, Parcel XI was subdivided into Parcels XI–A and Parcel XI–B. Parcel XI–A is the southern most part of Parcel XI and consists of 46.33 acres. It is referred to as "North Port." North Port Development, Inc. owns North Port and its principal is Mr. Barnard. Parcel XI–A is apportioned 154 Debt Service ERCs, 154 Maintenance ERCs, and 117 Capacity Reserve ERCs.

Parcel XI–B is the remaining 96.43 acres now owned by the Debtor. It is apportioned 188 Debt Service ERCs, 188 Maintenance ERCs, and 183 Capacity Reserve ERCs. The principal amount of the indebtedness allocated to the Debtor is the sum of $1,197,655. Later, Parcel XI–B was subdivided into Parcels XI–C and XI–D. Accordingly, the Debtor's Property consists of Parcels XI–B, XI–C and XI–D. (Jt. Stip. ¶ s 31–33).

### STATUS OF DEVELOPMENT OF THE NORTH AND SOUTH SIDE OF THE PROPERTY IN 1993

At the time relevant, the south side of the Port of the Islands at Newport had a hotel and condominium complex and on the west side there were some commercial buildings and a large density of condominiums, multi-family units, and single-family units. On the east side, there was commercial property in the area referred to as the Stella Maris single-family homes, also referred to as Phase 1 and 2 developments. With the exception of the hotel, the remaining property on the south side was residential. Even the hotel subsequently had been turned into a condominium. The main entrance of the Property south of U.S. 41, in the southeast quadrant, had a landscaped entry with a large Port of Call sign. Newport Drive is the main road going all the way to the end of Phase 1. It has a landscaped median running the full length of the road, with irrigation and landscaping at the entrance of the gate to the different cays on the left side.

The Cays also have at the entrance cement planters and a large sign "Colony Cays of Port of the Islands." The road is paved and there are several interlocking areas, all of which are completely developed.

In contrast, the north side of the Property of U.S. 41, a portion of the property purchased by the Debtor, is undeveloped with the exception of the RV Park and the gun club. The RV Park has 99 useable sites. The Debtor's Property also has a hotel, which has not been operated and is closed. The balance of the Debtor's Property is vacant. The roads were and are still in disrepair. The drainage is inadequate. It has no lighting, no landscaping, and no irrigation although there was water and sewer hookup to the RV site. There is also a dilapidated barn, which already has been condemned. The building attached to it is referred to the Tack Room is also in disrepair. The property has no roads, curbs and is full of potholes. (Db. Ex. 69, 70 and 71). According to the development plan, the CID had contemplated that on the north side of Parcel XI, an RV center that would utilize 750 RV sites, which would represent 52.1% of the total development potential.

### ACQUISITION OF A PORTION OF PARCEL XI BY THE DEBTOR

On September 5, 1995, J.J. Marchand Corporation, Ltd. (J.J. Corp.) and/or as-

signs entered into a "Contract for Sale," with the Developer for the purchase of the RV Park and Gun Club (the Debtor's Property). (Jt.Ex. 57). At that time, J.J. Corp. was the current manager of the RV park. On September 22, 1995, J.J. Corp. entered into an "Assignment and Assumption Agreement" with Olde Florida Investments, Inc., the Debtor, and assigned the sales contract to the Debtor. (Jt.Ex. 58). Also on this date, the Debtor acquired title to the subject property by Special Warranty Deed. (Jt.Ex. 62). This deed was recorded on the public records on September 25, 1995.

Ms. Marlene Marchand is the sole shareholder and officer of Olde Florida Investments, Inc, a limited partnership. The Debtor is a general partner of the limited partnership. She is also the sole limited partner of the Debtor. Olde Florida Land Trust Number 97–328 (Land Trust) was the previous owner of Parcel XI–D, the conservation area adjacent to the RV park. Ms. Marchand is the sole beneficiary of the Land Trust. Ms. Marchand, as trustee of Land Trust, quit claimed Parcel XI–D to the Debtor on June 3, 2002. (Jt.Ex. 65).

Prior to the purchase of the Debtor's Property in 1995, Ms. Marchand viewed the property and engaged the services of an attorney to conduct due diligence. She was fully aware that the Debtor's Property was already subject to a bonded indebtedness held by Allstate. She was also fully aware that the Debtor's Property was subject to the 1993 reassessment and a yearly assessment to meet the obligations of the CID, including the debt service covered by the Bonds.

As noted earlier, initially the Tax Collector billed the property owners for the assessment. And, at the same time, they were also billed for ad valorem taxes. In turn, the Tax Collector turned over non-ad valorem collections to Allstate. In the year 2001, this was changed and the property owners are now billed directly by the CID. If the property owner did not pay the assessment, the non-payment triggered a default. This in turn created the right of the Tax Collector to sell the tax certificate to the public the same way tax certificates were sold for delinquent ad valorem taxes.

The initial annual assessment on the Debtor's Property was in the vicinity of $200,000. Ms. Marchand questioned this amount of the assessment, in light of the total absence, according to Ms. Marchand, of any meaningful infrastructure. Notwithstanding her misgivings, the Debtor proceeded to and acquired the subject property.

It is without serious dispute that the Developer and the CID made a full and complete disclosure to Ms. Marchand as to the extent of the assessments and the particular amounts levied on the subject property. The Contract for Sale contained specific language notifying J.J. Corp. of the debt service assessment encumbering the property. In Paragraph 10, it clearly states that the subject property is part of the CID, and that the buyer should be aware that the CID imposes taxes and assessments on the property in order to pay for the construction, operation, maintenance and cost of certain public facilities within the CID. Moreover, she acknowledged that she was aware of the current rate of billing of $921 per unit billed by the Tax Collector and water and sewer standby fees of approximately $2,500 per month. (Jt.Ex. 57). Additionally, the Special Warranty Deed likewise referenced that the Debtor's Property was subject to assessments. (Jt.Ex. 62).

Although fully aware of the burdens of the property she was about to acquire, and her concern about the extent of the assess-

ment and the validity of the assessment, at no time prior to filing the present action did Ms. Marchand seek either to file a petition to equalize the assessments or institute any action in State court to contest the validity of the assessment itself, all of which were available remedies that could have been pursued to address any concern she may have had.

As noted earlier, the reassessment in 1993 discarded the approach of the 1990 assessment, which was based on the direct benefit to the property that was assessed. Instead, the 1993 reassessment established a system wide assessment in order to raise the funds necessary for debt service, and the maintenance and the reserve, mentioned earlier. It is without dispute that several of the improvements, which were proposed by CID, did not physically and directly benefit the property purchased by the Debtor. Through the testimony Craig Pajer, the civil engineer hired on behalf of the Debtor, the following projects were included in the proposed development by the CID but did not directly benefit the Debtor's Property:

a. South wastewater treatment plant expansion;

b. Fire irrigation pump system;

c. Southwest quadrant fire/irrigation distribution system;

d. Sunrise Cay roads and utilities;

e. East channel backbone utilities;

f. East channel SRF local utilities;

g. Delivery system from northeast to southeast and southwest;

h. East channel backbone roads and drainage;

i. East channel SFR local roads and drainage;

j. Sunrise Cay roads and drainage; and

k. Irrigation meter.

Neither the CID nor Allstate dispute the foregoing but contend that it was proper to make the assessment on the Debtor's Property based on its future potential development. They assert that the CID does not have to demonstrate that the Debtor's Property is actually and directly benefited by these projects. Instead, as a result of these projects, even though they do not directly benefit the Debtor's Property, they enhanced or will enhance the value of all of the parcels within the CID, including the Debtor's Property.

According to the CID and Allstate's expert, the market for the Debtor's Property as of June of 2002, with the existing development rights was $1,220,000. The market value, without the improvements and existing development rights, was $390,000. The difference of $833,000, according to the expert, represented enhancement to the value of the land as a result of the improvements and development rights. (Df.Ex. 4).

The fault of this proposition should be evident that the record indicates the expert testimony evaluation is as of 2002 and not when the assessments were made, or back in the year 1993. Thus, the increment in value had to be brought back to 1993, which would fix the value at $680,000. Moreover, there is nothing in this record to establish what the market value of the properties, including the Debtor's Property, was at the time the reassessment was put into force in the year 1993.

Basically, these are the facts developed at the final evidentiary hearing through testimony of witnesses, stipulation of the parties, and the voluminous documentary evidence. Based on these, each side contends that the 1993 assessment, which is the basic issue under consideration, is valid according to Allstate and CID, and invalid according to the Debtor.

## RESPECTIVE CONTENTIONS
## OF THE PARTIES

### THE DEBTOR:

It is the Debtor's first contention that the 1993 reassessment is invalid because the CID failed to comply with the statutory preconditions for conducting the reassessment as required by *Fla. Stat.* § 170.14. According to the Debtor, this Section provides, *inter alia,* that if the governing authority of the municipality is required to make new assessments, it can only be made if the previous assessment was either in whole or in part annulled, vacated, or set aside by judgment of any court. The Debtor further asserts that the Section provides that if the governing authority of any municipality is satisfied that the previous assessment was irregular or defective, and therefore the same cannot be enforced or collected, or if the governing authority of a municipality omitted to make such an assessment when it could have done at the initial assessment, only then is the reassessment proper and authorized.

The Debtor's position is that the CID has made no findings prior to making the reassessment in 1993 or any time thereafter that the 1990 assessment was irregular or defective; that the same could not be enforced or collected; or that the CID did not omit to make an assessment in 1990 against the property, which was for some reason not done and overlooked.

The Debtor also asserts that the assessment levied by the CID is invalid because the Debtor was never connected to the majority of the improvements. In this connection, the Debtor cites *Fla. Stat.* § 170.01(1)(k), which provides in essence that no collection of a special assessment shall be made until the specially benefited property is connected to the capital improvement. It is the Debtor's contention that the Debtor's property was never con-

nected to the majority of these improvements and did not have the capacity to connect to the majority of these improvements. According to the Debtor, the 1993 reassessment imposed on the Debtor's Property was grossly disproportionate to the actual and direct benefit conferred on the Debtor's Property by the proposed capital improvements, which have been actually accomplished.

### CID & ALLSTATE:

It is the contention of the CID that the charges imposed on the Debtor's Property, by the 1993 reassessment were not "taxes." Thus, the Debtor's reliance on Section 505 of the Bankruptcy Code is misplaced and not applicable. Next, it is the contention of the CID and Allstate that the Debtor is estopped from challenging the validity of the 1993 assessment and whatever rights it may have had, have been waived. Lastly, it is contended that the action presently before this Court is barred by the statute of limitations and laches. And, although not fully articulated, it is also contended that the Debtor has failed to pursue remedies, which were available to it to correct whatever infirmities there were, if any, with respect to the 1993 reassessment.

### THE TAX COLLECTOR:

The Tax Collector and the persons who purchased the tax certificates, contend that: (1) it would be an improper use of this Court's authority to reallocate assessments incurred prior to the Debtor's ownership of the subject property when the Debtor specifically purchased the subject property with knowledge of the assessments; and (2) if the amount collected by the CID is ruled excessive and/or reallocated to other parcels, the Tax Certificate Holders are entitled to a refund to the extent each holder paid the erroneous

amount, and the CID is to be charged to make that refund.

Moreover, the Tax Collector states that (1) the Debtor received notice of the delinquent non-ad valorem tax assessments pursuant to *Fla. Stat.* § 197.322; (2) the Tax Collector sold the tax certificates representing the outstanding ad valorem taxes and the non-ad valorem assessments to third parties for the years 1996, 1997, 1998, 1999 and 2000; and (3) the Tax Certificate Holders believed that the assessments were proper and would not have purchased the tax certificates if they had been aware of any of the problems with the non-ad valorem assessments.

Lastly, the Tax Collector contends on behalf of the Tax Certificate Holders that while there is a four-year statute of limitations for correction or voiding tax certificates and for making a refund claim, pursuant to *Fla. Stat.* § 197.182(1)(c), exceptions contained in *Fla. Stat.* § 197.432(10) and § 197.44(4) apply to the correction or cancellation of certificates as authorized by those statutes. Based on the foregoing, the Tax Certificate Holders and the Tax Collector contend that CID is liable to the Tax Certificate Holders for any excess taxes paid by such holders for tax certificates to the extent of the adjustment of the CID tax is established.

*LEGAL ANALYSIS AND FINDINGS*

It should be noted at the onset that the validity, *vel non*, of the 1993 assessment is presented for this Court's consideration by the Debtor pursuant to Section 505(a) of the Bankruptcy Code. This Section authorizes this Court to determine the amount and legality of any tax, fine or penalty relating to a tax. That immediately brings forth the threshold issue of whether or not the 1993 reassessment is, in fact, a tax.

■ It is well established that whether a particular obligation imposed is a tax within the meaning of this section is a federal question. *City of New York v. Feiring*, 313 U.S. 283, 285, 61 S.Ct. 1028, 85 L.Ed. 1333 (1941); *County Sanitation Dist. No. 2 of Los Angeles v. Lorber Indus. of Cal., Inc. (In re Lorber Indus. of Cal., Inc.)*, 675 F.2d 1062, 1066 (9th Cir. 1982). In order to determine the character of the obligation, the Ninth Circuit in the *Lorber* case, stated that the tax must have all of the following attributes: (1) an involuntary pecuniary burden, regardless of name, laid upon individuals or property; (2) imposed by, or under authority of the legislature; (3) for public purpose, including the purposes of defraying expenses of government or undertaking authorized by its; and (4) under the police or taxing power of the state. The label given to a particular obligation is not relevant, and the Court must consider whether or not, pursuant to the principles established by *Lorber*, the assessment is a tax.

■ While the interpretation of the term "tax," by Florida Courts is not governing, it is illustrative and helpful to consider. Florida Courts have long recognized the distinction between taxes and special assessments. It is the special and peculiar benefit conferred on the property that distinguishes a special assessment from a tax. *City of Boca Raton v. State*, 595 So.2d 25, 29 (Fla.1992). As one early case stated:

A "tax" is an enforced burden of contribution imposed by sovereign right for the support of the government, the administration of the law, and to execute the various functions the sovereign is called on to perform. A "special assessment" is like a tax in that it is an enforced contribution from the property owner, it may possess other points of similarity to a tax, but it is inherently different and governed by entirely dif-

ferent principles. It is imposed upon the theory that that portion of the community which is required to bear it receives some special or peculiar benefit in the enhancement of value of the property against which it is imposed as a result of the improvement made with the proceeds of the special assessment.

. . . . .

[I]t seems settled law in this country that an ad valorem tax and special assessment, through cognate in immaterial respects, are inherently different in their controlling aspects. . . .

*Klemm v. Davenport,* 100 Fla. 627, 129 So. 904, 907–908 (1930).

 It should be evident from the foregoing, and this Court is satisfied that the 1993 reassessment is not a tax which would come within the purview of Section 505 of the Code. This conclusion, however, does not end the inquiry, and one still must consider, by virtue of the second approach by the Debtor, the challenge of the validity of the 1993 reassessment pursuant to 28 U.S.C. § 157(b)(2)(K). This Section provides that the proceeding to determine the validity, extent and priority of liens is a "core proceeding" on which this Court has the power to determine with finality the issues raised there under and enter appropriate orders and judgments, subject only by a timely filed appeal prosecuted pursuant to 28 U.S.C. § 158.

Based on the foregoing, this Court is satisfied that this Court has core jurisdiction to consider the issues raised by the Debtor in the Second Amended Complaint. The applicable statutes of the State of Florida, which governs the establishment of community improvement districts and the special assessments authorized by statute, must determine the validity of the 1993 reassessment.

 This leads to the ultimate merits of the respective positions advanced by the parties. It should be noted that the burden to rebut the presumption of correctness on special assessments is placed on the entity challenging the assessment, in this case the Debtor. This presumption may be overcome only by strong, direct, clear and positive proof. *Workman v. Hernando County,* 790 So.2d 598 (Fla. 5th DCA 2001).

 In support of the first basis of its argument, the Debtor contends that the 1993 reassessment was invalid because the CID failed to meet any of the conditions precedent for reassessment pursuant to *Fla. Stat.* § 170.14. This Court is satisfied that this argument is without merit. This Section, 170.14, lists certain events that would trigger reassessment and the proper manner within which to reassess as a result of these events. However, this Section does not mandate that reassessments must be invalid, unenforceable or set aside by judgment, instead the Section reads: "If any special assessment. . . the governing authority shall . . . ." In this instance, the Debtor disregarded the word "if" at the beginning of this section. "*If* any special assessment . . ." is found unenforceable, is not the equivalent that the governing authority can only reassess in those instances.

 When the language of the statute is clear and unambiguous and conveys a clear and definite meaning, the statute must be given its plain and obvious meaning. *A.R. Douglass, Inc. v. McRainey,* 102 Fla. 1141, 137 So. 157 (1931). If the Legislature did not intend the results mandated by the statute's plain language, the appropriate remedy is for the Legislature to amend the statute. *Overstreet v. State,* 629 So.2d 125, 126 (Fla.1993). "When a court construes a statute, its goal is to

ascertain legislative intent, and if the language of the statute under scrutiny is clear and unambiguous, there is no reason for construction beyond giving effect to the plain meaning of the statutory words." *Aetna Cas. & Sur. Co. v. Huntington Nat'l Bank*, 609 So.2d 1315, 1317 (Fla.1992). Applying the foregoing, this Court is satisfied that it is not a condition precedent for a reassessment that a prior assessment must be found to be invalid, unenforceable, or be set aside by judgment.

Before considering the balance of the propositions urged by the Debtor, in light of the defenses raised by the CID and Allstate, it would be appropriate to consider the defenses first. This is so because if these defenses are found to be valid, they would operate as an absolute bar to the granting of any relief the Debtor seeks. These defenses are as follows: First, the Debtor is not entitled to any relief pursuant to Section 505 of the Code because the charges imposed on the Debtor's property were not "taxes." Second, the Debtor is estopped or waived any right to challenge the 1993 assessment not only because Ms. Marchand knew about the assessments but also because the Debtor stepped into the shoes of the Developer and thus is estopped from seeking the relief sought. Lastly, the claim asserted by the Debtor is barred by both the statute of limitations and laches.

This Court has already determined that the assessments are not "taxes," and therefore, application of Section 505 of the Code is inappropriate. Taking the last defense first, this Court finds as follows.

 Laches is an affirmative defense, and as such, the burden of proving it is on those who assert it, and it must be proved by clear and positive evidence. Laches is not based upon the number of years, which have elapsed between the accruing of rights and the assertion of them, but upon unreasonable delay in enforcing a right, coupled with a disadvantage to the person against whom the right is sought to be asserted. *Peacock v. Firman*, 177 So.2d 560 (Fla. 3rd DCA 1965), *citing Bethea v. Langford*, 45 So.2d 496 (Fla.1949); *Van Meter v. Kelsey*, 91 So.2d 327 (Fla.1956). *See also Smith v. Town of Bithlo*, 344 So.2d 1288 (Fla. 4th DCA 1977).

 A defendant who seeks to assert the doctrine of laches must prove: (1) conduct on the part of the defendant giving rise to the situation of which complaint is made; (2) failure of the plaintiff, having had knowledge or notice of the defendant's conduct, to assert his rights by suit; (3) lack of knowledge on the part of the defendant that plaintiff will assert the right on which he bases his suit; and (4) injury or prejudice to the defendant in event relief is accorded to the plaintiff. *Greene v. Bursey*, 733 So.2d 1111 (Fla. 4th DCA 1999).

 Applying the foregoing law to the facts in this case, this Court is satisfied that the Defendants have proven that the affirmative defense of laches is applicable. First, it is without dispute that the complained of action was the 1993 reassessment. Second, it is without dispute that the Debtor, through Ms. Marchand, was fully aware of the reassessment at the time of the purchase of the Debtor's Property in the year 1995. Third, the record is undisputed that Ms. Marchand has never applied for equalization or otherwise overtly and affirmatively sought action against the CID or Allstate in State court or any other judicial proceeding regarding the reassessments. Moreover, with respect to the eight hundred or so homeowners and the Tax Certificate Holders, they certainly had no knowledge that Ms. Marchand would bring this type of action against them. The Tax Certificate Holders pur-

chased the tax certificates in good faith and in reliance of the validity of the 1993 reassessment. And, likewise, the homeowners purchased their home sites on the south side of the Property in good faith and in reliance of the validity of the 1993 reassessment. Fourth, the injury or prejudice to all of the Defendants, especially the Tax Certificate Holders and the homeowners in the event that this Court grants the relief sought by the Debtor would be inequitable.

As this Court is a court of equity, to invalidate now and reallocate assessments, which would negatively impact the economic interest of people in reliance of the allocation of the assessment purchased property on the south side, would be grossly unfair and inequitable. The fact that the homeowners, whose interest would be impacted if the 1993 assessment is declared to be invalid, and would be subject to an additional assessment, did not actively participate in this litigation opposing the Debtor's position is of no consequence. This is so because this Court cannot and should not lose sight of the economic impact on those property holders who, in good faith, purchased their property relying on the reallocation of the assessments.

The Court received extensive evidence on the propriety of the system-wide methodology used by the CID on 1993. The Debtor primarily relied on the proposition that the approach used in 1990 was the proper approach and that several of the capital improvements did not directly benefit Parcel XI. Therefore, it was not in compliance with the law. But, most of what could be said on this point was that the evidence was in equilibrium and the record supported both methodologies used in 1990 and in 1993. This indicates that the Debtor failed to establish with the 1993 reassessment that the same was invalid

and that the CID should be required to start a new assessment on all of the properties by using the direct benefit approach.

In light of the foregoing, it is unnecessary for this Court to consider the balance of the defenses raised by the Defendants. A separate final judgment shall be entered in accordance with the foregoing.