In re BIDDISCOMBE
INTERNATIONAL,
L.L.C., Debtor.

Biddiscombe International,
L.L.C., Plaintiff,

v.

Stephen Gayheart and Biddiscombe
Laboratories, Inc., Defendants.

Bankruptcy No. 06–03853–8W1.
Adversary No. 06–00508.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Aug. 13, 2008.

Chad S. Bowen, David S. Jennis, Michael P. Brundage, Jennis Bowen & Brundage, P.L., Tampa, FL, for Debtor.

Benjamin E. Lambers, Timberlake Annex, Tampa, FL, for U.S. Trustee.

### AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW [1]

MICHAEL G. WILLIAMSON, Bankruptcy Judge.

#### Introduction

The parties to this adversary proceeding entered into a contract for the sale of the business and assets of Biddiscombe Laboratories, Inc. ("Biddiscombe") in October 2004. Stephen Gayheart ("Gayheart") was the manager and sole shareholder of Biddiscombe (together, "the Seller" or "the Defendants"). John Melville ("Melville") is the principal of the Plaintiff, Biddiscombe International, L.L.C. ("the Buyer") and personally negotiated the purchase of Biddiscombe with Gayheart. The Buyer brought this suit alleging, among other

---

1. The Court hereby amends its previous Findings of Fact and Conclusions of Law to reflect a recalculation of damages pursuant to the Court's ruling on the Defendant's motion to amend the judgment (Doc. No. 87), which came on for hearing on July 14, 2008. At the hearing, the Court also granted the Plaintiff's motion for an award of pre-judgment interest, on which the Court has already entered a separate Order (Doc. No. 94).

counts, fraudulent inducement into contract.

The Buyer alleges that during the negotiations leading up to the sale, the Defendants fraudulently misrepresented that Biddiscombe was a drug manufacturing business substantially in compliance with Food and Drug Administration ("FDA") regulations. These representations were made in affirmative statements during the contract negotiations and by holding Biddiscombe out to the world as a drug manufacturing business—registering as a drug manufacturing facility with the FDA and advertising itself as a drug manufacturing facility. Biddiscombe, the Plaintiff asserts, was not able to manufacture drugs in compliance with FDA regulations, and this fact was known by the Seller, who withheld that information in order to induce the Buyer into the sale. The Defendants deny ever representing that Biddiscombe could manufacture drug products and pled various affirmative defenses. The Court herein concludes that the elements of fraudulent inducement into contract have been proven in this case, and that the Buyer has suffered damages as a result, for which the Seller will be held liable.

### Findings of Fact

After two days of trial at which the testimony of seven witnesses was heard and thirteen exhibits were entered into evidence, the Court announced its findings in open court. The transcript of the Court's findings of fact is contained in the record and incorporated herein by reference. (Doc. No. 75.) The following is a summary of those findings.

#### Biddiscombe

Gayheart was the manager and sole shareholder of Biddiscombe, a company whose business was to manufacture tanning and skin care products. Biddiscombe was registered with the FDA as a drug manufacturing facility (Pl.'s Ex. 4), although the facility only manufactured cosmetics, not drugs, as those products are defined by the FDA. Drug manufacturing facilities are regulated under federal law by 21 C.F.R. part 211 ("Part 211"), which establishes Good Manufacturing Practices for drug-producing facilities. Gayheart is a sophisticated businessperson who has spent many years in the cosmetic and drug manufacturing industries and is familiar with the structure of FDA regulations.

In March 2003, the FDA inspected the Biddiscombe facilities and issued an Establishment Inspection Report from March 26 and 28, 2003 ("2003 FDA Report"). (Pl.'s Ex. 9.) In this report, the inspector described Biddiscombe as a cosmetics and "OTC" or over-the-counter drug manufacturer and enumerated twelve objectionable conditions, which constitute significant deviations from the Good Manufacturing Practices under Part 211. (Pl.'s Ex. 9, 2, 7–9.)

Prior to the sale, Biddiscombe produced and released an advertisement that represented that it was able to manufacture drugs and that it was in compliance with Part 211. (Pl.'s Ex. 6.) Gayheart at first testified during trial that he had not authorized the release of this advertisement, but upon questioning by the Court, admitted that perhaps it had been discussed, that they were conducting a "fishing expedition"—which the Court took to mean that Biddiscombe was trying to determine whether it would be economically worthwhile to make the changes necessary to be able to manufacture drugs.

According to the expert testimony of Dr. Blume, the Plaintiff's expert witness, and Mr. Lieberman, the Defendant's expert witness, as well as Gayheart's own testimony at trial, it is clear that despite these representations, Biddiscome was not able

to manufacture drugs. Gayheart admitted that the facility could not manufacture drug products "without investment to do so" and that the facility "didn't comply with all parts of 211." (Trial Tr. vol. 2, 18:4, 45:9, Oct. 23, 2007.)

*Pre–Contract Representations*

In late June 2004, Gayheart entered into discussions with a group of potential buyers, including Melville, regarding the possible sale of the business and assets of Biddiscombe. During the trial, Melville testified that during these discussions, he and Gayheart specifically discussed the business's compliance with Part 211. Gayheart refuted this allegation, but admitted upon further questioning that they may have discussed the facility's compliance with Part 211 in general terms. (Trial Tr. vol. 2, 8:16–9:1.) It is the Court's conclusion that Gayheart's testimony on this point was not credible, and that as part of the pre-contract negotiations the parties did indeed discuss and Gayheart affirmatively represented that Biddiscombe was in compliance with Part 211. Also prior to the sale, Melville saw the advertisement issued by Biddiscombe (Pl.'s Ex. 6) that indicated Biddiscombe could manufacture drug products.

The discussions culminated in the signing of the Asset Purchase Agreement ("APA") (Pl.'s Ex. 2) for the sale of the business and substantially all of the assets of Biddiscombe on October 25, 2004, to Biddiscombe International, L.L.C., an entity created for this purpose by Melville and other persons. The parties were represented by counsel and negotiated the specific terms of the contract. The APA contained two provisions, Section 2.7(b) and (d), that asserted the compliance of the facility with FDA regulations, its registration with the FDA and all other appropriate authorities, and that the "facilities … comply in substantial part with Good Man-

ufacturing Practices requirements set forth in 21 C.F.R. Part 211." (Pl.'s Ex. 2, 11–12, § 2.7(b), (d).)

At trial, the Court accepted testimony of two expert witnesses on the question of FDA regulations and what it means for a business or facility to be compliant with Part 211. It was the testimony of these witnesses, which the Court accepts, that Part 211 applies exclusively to facilities that manufacture drugs. Although there was some discussion at trial that perhaps the facilities themselves complied with Part 211 although the business did not, Gayheart's own expert, Mr. Lieberman, testified that there was no separate registration for facilities under Part 211—that a business was either in compliance or was not. (Trial Tr. vol. 2, 231:11–232:19.) Furthermore, it was clear from the testimony of these experts that the facilities themselves were not in compliance with the relevant sections of Part 211. Only after the closing of the sale was Melville provided a copy of the 2003 FDA Report listing Biddiscombe's significant deviations from Part 211.

The parties agreed to a selling price of $3,005,000. At closing, $2,300,000 was transferred to Gayheart along with a note for $705,000. Only one payment of $32,000 was made under this note, bringing the total paid to Gayheart up to $2,332,000, with $673,000 outstanding.

**Conclusions of Law**

The Court has jurisdiction over this proceeding under 28 U.S.C. § 1334, and the parties have consented to the entry of a final judgment in this adversary proceeding pursuant to 28 U.S.C. § 157.

*Fraudulent Inducement into Contract*

This case, boiled down from its several counts, is, in essence, a fraud action. Under Florida law, in an action for fraudulent inducement, the plaintiff must

915

show (1) a false statement of a material fact; (2) that the defendant knew or should have known was false; (3) that was made to induce the plaintiff to enter into a contract; and (4) that proximately caused injury to the plaintiff when acting in reliance on the misrepresentation. *Bradley Factor, Inc. v. United States,* 86 F.Supp.2d 1140, 1146 (M.D.Fla.2000) (citing Florida law); *see also Thompkins v. Lil' Joe Records, Inc.,* 476 F.3d 1294, 1315 (11th Cir. 2007) (citing Florida law); *Biscayne Boulevard Props., Inc. v. Graham,* 65 So.2d 858, 859 (Fla.1953) (quoting *Wheeler v. Baars,* 33 Fla. 696, 15 So. 584, 588 (1894)) ("A false representation of material fact, made with knowledge of its falsity, to a person ignorant thereof, with intention that it shall be acted upon, followed by reliance upon and by action thereon amounting to substantial change of position, is a fraud of which the law will take cognizance."). Fraud must be established by "a preponderance or greater weight of the evidence." *Wieczoreck v. H & H Builders, Inc.,* 475 So.2d 227, 228 (Fla. 1985).

■ All four elements of fraudulent inducement have been established in this case.[2] First, there was a false statement of material fact. Based on the oral statements and pre-contract discussions between the parties in addition to the language of the contract, the Court concludes that there was an affirmative representation by the Seller that the business was licensed to manufacture drugs in compliance with Part 211. This finding is supported by the circumstances surrounding the sale, including the Biddiscombe advertisement, which indicates that Biddiscombe was holding itself out as a drug manufac-turing facility. Furthermore, the Court concludes based on the expert testimony presented and Gayheart's admissions at trial that Biddiscombe could not manufacture drug products in compliance with Part 211.

Second, the Court concludes, based on the clear evidence, that the statements were knowingly false when made. At trial, it was Gayheart's testimony that Biddiscombe could not manufacture drugs and was not substantially in compliance with Part 211. Therefore, it is clear that Gayheart's representation that Biddiscombe was licensed to manufacture drug products and was in compliance with Part 211 was knowingly false.

Third, the Court concludes that the statements were made with the intent of inducing the Buyer to enter into the contract for sale. It is significant that Gayheart did not provide the 2003 FDA Report, which listed Biddiscombe's significant deviations from Part 211, to the Buyer until after the sale.

■ Finally, the Court concludes that the Buyer reasonably relied on these false representations and, in so doing, was harmed by paying substantially more for the business and assets of Biddiscombe than it would have done had it known that the business could not manufacture drug products. The tort of fraudulent inducement protects "a plaintiff's right to justifiably rely on the truth of a defendant's factual representation in a situation where an intentional lie would result in loss to the plaintiff." *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.,* 685 So.2d 1238, 1240 (Fla.1996) (quoting *Woodson v. Martin,*

---

2. In holding for the Plaintiff under the claim for fraudulent inducement into contract, the Court does not find it necessary to address the third count of the Complaint for breach of contract. The second and fifth counts were voluntarily dismissed before trial (Doc. No. 58). The Court indicated that it would hear any motions for attorneys' fees after the conclusion of the trial, which is the gravamen of the fourth count of the Complaint.

663 So.2d 1327, 1330 (Fla. 2d DCA 1995) (en banc) (Altenbernd, J., dissenting)). The Buyer's "ability to negotiate and make informed decisions as to the contract[,]" in this case, was undermined by the Seller's misrepresentations that Biddiscombe was able to manufacture drug products. *Bradley Factor*, 86 F.Supp.2d at 1145.

### Affirmative Defenses

The Court has considered all of the affirmative defenses asserted by the Defendants and concludes that each defense fails as a matter of law based on the Court's findings of fact. The first affirmative defense of standing, which alleged that a receiver lacked standing to bring the Complaint in state court, is no longer at issue in this adversary proceeding in bankruptcy between the debtor Buyer and the Seller. The second affirmative defense of truth fails because the Court has concluded that not all of the representations of fact made by the Defendants were true.

 The third affirmative defense of estoppel by merger fails because of the "well-established rule that alleged fraudulent misrepresentations may be introduced into evidence to prove fraud notwithstanding a merger clause in a related contract." *Wilson v. Equitable Life Assurance Soc'y of the U.S.*, 622 So.2d 25, 27 (Fla. 2d DCA 1993) (citing *Nobles v. Citizens Mortgage Corp.*, 479 So.2d 822, 822 (Fla. 2d DCA 1985)). The tort of fraudulent inducement into a contract necessarily requires the establishment of fraudulent pre-contract statements and representations. *See HTP, Ltd.*, 685 So.2d at 1239–40.

 The fourth affirmative defense of estoppel and waiver does not apply. Justifiable reliance is necessary to have an actionable fraud. *Hillcrest Pac. Corp. v. Yamamura*, 727 So.2d 1053, 1057 (Fla. 4th DCA 1999). It is part of the Court's conclusions that the Buyer reasonably relied on the Seller's misrepresentations, and therefore there was no waiver. The Florida Supreme Court has held that "a recipient may rely on the truth of a representation, even though its falsity could have been ascertained had he made an investigation, unless he knows the representation to be false or its falsity is obvious to him." *Besett v. Basnett*, 389 So.2d 995, 997–98 (Fla.1980) (reasoning that someone "guilty of fraudulent misrepresentation should not be permitted to hide behind the doctrine of caveat emptor").

 The fifth affirmative defense asserting the economic loss rule also fails, because Florida's economic loss rule does not bar the tort of fraudulent inducement. *HTP, Ltd.*, 685 So.2d at 1240. The Florida Supreme Court has described the economic loss rule as a "judicially created doctrine that sets forth the circumstances under which a tort action is prohibited if the only damages suffered are economic losses." *Indemnity Ins. Co. of N. Am. v. Am. Aviation, Inc.*, 891 So.2d 532, 536 (Fla. 2004). The contractual privity arm of the economic loss rule prohibits "tort actions to recover solely economic damages for those in contractual privity . . . ." *Id.* The doctrine attempts to prevent parties from circumventing contractual agreements in order to achieve a better bargain than originally made. *Id.* Thus, tort actions are barred where the defendant has committed no breach of duty apart from the breach of contract. *Id.* at 537; *see also HTP, Ltd.*, 685 So.2d at 1239.

 The economic loss rule does not, however, bar "torts committed independently of the contract breach, such as fraud in the inducement." *Indemnity Ins.*, 891 So.2d at 537; *see also HTP, Ltd.*, 685 So.2d at 1239–40. The Florida Supreme Court has made clear that it "never intended to bar well-established common

law causes of action" through the economic loss rule. *Moransais v. Heathman,* 744 So.2d 973, 983 (Fla.1999). However, a party will not be allowed to bypass the economic loss rule by "disguis[ing]" a breach of contract action through the label of fraudulent inducement. *Int'l Star Registry of Ill. v. Omnipoint Mktg., L.L.C.,* 510 F.Supp.2d 1015, 1026 (S.D.Fla.2007). A claim of fraudulent inducement may be barred "where the alleged fraud contradicts a subsequent written contract" or when the "misrepresentations relat[e] to the breaching party's performance under a contract . . ., because such misrepresentations are interwoven and indistinct from the heart of the contractual agreement." *N. Am. Clearing, Inc. v. Brokerage Computer Sys., Inc.,* No. 07–1503, 2008 WL 341309, at *3 (M.D.Fla. Feb. 5, 2008) (slip-op.).

▮ The Court has concluded that in the months leading up to the sale of Biddiscombe, Gayheart made affirmative representations to Melville that Biddiscombe could manufacture drug products. These representations were false, and Melville relied upon them to his detriment. The written contract does not contradict these pre-contract misrepresentations of the Seller, which are at the heart of the fraudulent inducement into contract claim and are not interwoven and indistinct from the subsequent contract. Therefore, the economic loss rule does not bar this valid claim based on the common law tort of fraudulent inducement.

The sixth affirmative defense of negligence of the Plaintiff does not apply because the Plaintiff's allegedly negligent post-sale actions have no bearing on the pre-sale tort of fraudulent misrepresentation. The damages as calculated are based on the actual value of Biddiscombe on the date of the sale, before such negligence allegedly caused devaluation of the business.

▮ The seventh affirmative defense of laches also does not bar this action. Laches is an equitable doctrine that is applied to bar a claim at equity based not upon the number of years that have lapsed, but "upon unreasonable delay in enforcing a right, coupled with a disadvantage to the person against whom the right is sought to be asserted." *Peacock v. Firman,* 177 So.2d 560, 562 (Fla. 3d DCA 1965); *see also In re Olde Fla. Invs., Ltd.,* 293 B.R. 531, 544 (Bankr.M.D.Fla.2003).

The sale of Biddiscombe was completed on October 25, 2004. This action was commenced on July 28, 2006. This Court cannot conclude that a delay of less than two years from the date of sale to the date of the filing of this lawsuit is unreasonable. Moreover, the doctrine of unclean hands would likely bar the Defendants from relying on the equitable defense of laches. *See Martin v. Brevard County Pub. Sch.,* No. 6:05–CV–971, 2007 WL 496777, *21 (M.D.Fla. Feb. 13, 2007) (slip-op.) (holding that a defendant could not rely on the equitable defense of estoppel because he came to the court with unclean hands); *Williamson v. Williamson,* 367 So.2d 1016, 1018 (Fla.1979).

▮ Under Florida law, the statutes of limitations for actions at law also will apply to the same subject matters at equity. Fla. Stat. § 95.11(6) (2007). The statute of limitations for a legal or equitable action founded upon fraud is four years. Fla. Stat. § 95.11(3)(j). A cause of action founded upon fraud accrues when the facts giving rise to the cause of action "were discovered or should have been discovered with the exercise of due diligence . . ." but must commence within 12 years of the date of commission of the fraud. Fla. Stat. § 95.031(2). The fraud in this case was discovered at some time after the

sale on October 25, 2004. This action was commenced on July 28, 2006, well within four years of discovery. Therefore, neither laches nor the statute of limitations bar this action.

### Damages

■■■■ Damages in tort cases are compensatory—the goal is "to restore the injured party to the position it would have been in had the wrong not been committed." *Nordyne, Inc. v. Fla. Mobile Home Supply, Inc.,* 625 So.2d 1283, 1286 (Fla. 1st DCA 1993). Florida courts apply a two-pronged flexibility theory to damages in fraud, which allows courts to use either the out-of-pocket or the benefit-of-the-bargain rule, "depending upon which is more likely to fully compensate the injured party." *Id.; see also Morgan Stanley & Co., Inc. v. Coleman (Parent) Holdings, Inc.,* 955 So.2d 1124, 1128 (Fla. 4th DCA 2007). The out-of-pocket rule would have the court calculate damages as the difference between the purchase price and the actual value of the property. *Kind v. Gittman,* 889 So.2d 87, 90 (Fla. 4th DCA 2004). If this measure of damages does not fully compensate the injured party, the court may use the benefit-of-the-bargain rule, under which damages are calculated as the difference between the value of the property as represented and the actual value of the property. *Morgan Stanley,* 955 So.2d at 1128. In this case, the Plaintiff has employed the out-of-pocket rule in its calculation of damages, and the Court agrees that is the appropriate measure of damages.

■■■■ To determine damages under either measure, the Court must calculate the actual value of the property at the time of sale. *Id.* There are several ways to value a business, just as there are several ways to value real property. Businesses are generally not valued based on a cost

approach, because the whole operating concern is considered to have greater value than its separate pieces. The most common measure of the value of a business is the cash flow approach, which measures value based on how much income the business will produce to provide a return on the investment. The value is determined by multiplying the business's earnings before interest, taxes, depreciation and amortization, or "EBITDA," by a certain number that is determined based on the type of industry. Generally, a higher multiplier indicates a riskier and potentially more profitable industry.

■■■■ The Court heard testimony from several witnesses regarding the question of value. The Plaintiff's expert witness, Mr. Granger, valued the business based on a cash flow analysis, using a multiplier of 3.3, which he calculated based on the sale price. Mr. Granger adjusted his numbers by subtracting $269,000, the cost of increased expenses necessary to be able to manufacture drug products, and by reducing the EBITDA. By this method, Mr. Granger determined that the value of the business was $1,090,000. The Court finds Mr. Granger's calculations problematic. For instance, he provided no justification for both reducing the EBITDA and increasing expenses, and, while Mr. Granger subtracted anticipated increased expenses, there is no evaluation of projected concomitant increased income.

■■■■ The Court also heard testimony from Melville on the question of the value of Biddiscombe at the time of sale. Melville testified that he would have paid $1.2 million for the business had he known the relevant facts, a calculation based on an EBITDA multiplier of 2.5 to 3. (Trial Tr. vol. 1, 90:7–92:13.) While Melville is not an expert, he is a sophisticated businessperson and the owner of Biddiscombe. His testimony is admissible under Federal

Rule of Evidence 701. While Federal Rule of Evidence 702 and *Daubert* changed the standards regarding the admittance of expert opinion testimony based on specialized knowledge, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the admittance of lay testimony is governed by Rule 701, which has been interpreted to allow traditional forms of lay witness testimony, including the traditional practice of allowing an owner of property to testify as to its value. Fed.R.Evid. 701 advisory committee's note (noting that most courts allow an owner or officer of a business to testify as to its value or projected profits without the need to qualify the owner as an expert because such lay opinion testimony is based on a type of personal knowledge—the "particularized knowledge that the witness has by virtue of his or her position in the business"); *Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1196–98 (3d Cir.1995) (listing testimony as to the value of one's property as "quintessential Rule 701 opinion testimony"); *In re Levitt & Sons, L.L.C.*, 384 B.R. 630, 646 (Bankr.S.D.Fla.2008) (allowing the admission of testimony by a chief restructuring officer as to the corporate debtors' value because "the owner of personal property is qualified by [ ] ownership alone to testify as to its value"); *In re Brown*, 244 B.R. 603, 611 (Bankr.W.D.Va. 2000) (holding that the owner of property may testify as to its value "without demonstrating any additional qualifications to give opinion evidence"). Melville's testimony falls squarely in this traditional category of lay opinion. While it is unclear to the Court what EBITDA number Melville was using to calculate the $1.2 million amount, it is relevant that he testified that a 2.5 to 3 EBITDA multiplier would be appropriate for a cosmetic manufacturing business.

Finally, the Court heard testimony from Gayheart that several years before the sale an offer had been made for the business for $1.4 million, and that the business increased in value due to higher earnings after that time.

In calculating the value of Biddiscombe based on the evidence, the Court finds that it is reasonable to use the actual EBITDA the business earned in 2003, the year prior to the sale, which is $824,000. Using that EBITDA and the purchase price of $3,005,000, mathematically, the calculation calls for an EBITDA multiplier of 3.65. It is clear to the Court that an EBITDA multiplier is industry-specific. A cosmetic manufacturing business may not have the same EBITDA multiplier as a drug manufacturing business. Based on Mr. Melville's testimony, the Court concludes that a 2.5 EBITDA multiplier would have been the proper multiplier to apply to a cosmetics manufacturing business. Therefore, multiplying the 2003 EBITDA by the 2.5 multiplier, the Court finds that the actual value of the business on the date of sale was $2,060,000. The amount actually paid under the contract was $2,332,000. Therefore, using the out-of-pocket rule, the Court concludes that the damages of the Plaintiff are $272,000. In calculating damages in this way, the Court has taken into account as a setoff the Defendants' counterclaim for the remaining amount unpaid under the contract for sale.

## Conclusion

The Court will separately enter an amended judgment in favor of Biddiscombe International, L.L.C., against Stephen Gayheart, 3030 Hargett Lane, Safety Harbor, Florida 34695–5249, and Biddiscombe Laboratories, Inc., 3030 Hargett Lane, Safety Harbor, Florida 34695–5249, for $272,000 plus post-judgment interest. This Court will retain jurisdiction to enforce the amended judgment and to deter-

mine right, entitlement and amount of attorneys' fees and costs and to enter a separate judgment if necessary.