891 So.2d 532 (2004)
INDEMNITY INSURANCE COMPANY OF NORTH AMERICA, et al., Petitioners,
v.
AMERICAN AVIATION, INC., Respondent.
No. SC03-1601.
Supreme Court of Florida.
December 23, 2004.
*533 Hugh C. Griffin and Gary Y. Leung of Lord, Bissell and Brook, LLP, Chicago, IL, and Michael P. Bruyere, Thomas J. Strueber and Jonathan R. Friedman of Lord, Bissell and Brook, LLP, Atlanta, GA, for Appellant.
John M. Murray of Murray, Marin and Herman, P.A., Tampa, Florida and Carolyn A. Pickard of Murray, Marin and Herman, P.A., Coral Gables, FL, for Appellee.
Daniel S. Green of Ullman and Kurpiers, LLC, Tampa, FL and Tracy Raffles Gunn of Fowler, White, Boggs and Banker, P.A., Tampa, FL on behalf of the Florida Defense Lawyers' Association; and Richard A. Solomon of the Andersen Firm, P.C., Winter Park, FL on behalf of the Florida *534 Concrete and Products Association, Inc., As Amici Curiae.
PARIENTE, C.J.
The Eleventh Circuit Court of Appeals certified the following five questions of Florida law that are determinative of a cause pending in that court and for which there appears to be no controlling precedent:
1. WHETHER THE "ECONOMIC LOSS" DOCTRINE OF FLORIDA APPLIES TO ALLEGED TORTS IF THE DEFENDANT HAS PROVIDED SERVICES TO A PRODUCT RATHER THAN HAS SOLD A PRODUCT.
2. WHETHER THE "ECONOMIC LOSS" DOCTRINE OF FLORIDA APPLIES IF THERE IS NO CONTRACTUAL RELATIONSHIP BETWEEN THE PLAINTIFFS AND THE DEFENDANT.
3. WHETHER THE "ECONOMIC LOSS" DOCTRINE OF FLORIDA APPLIES TO THE FACTS OF THIS CASE WITH REGARD TO DAMAGE TO THE TOTAL AIRCRAFT AS OPPOSED TO MERE DAMAGE TO THE LANDING GEAR UNDER THE "OTHER PROPERTY" EXCEPTION.
4. WHETHER THE PROVIDING OF CERTIFIED MECHANICAL SERVICES FALLS UNDER THE CATEGORY OF THE "PROFESSIONAL SERVICES" EXCEPTION TO THE "ECONOMIC LOSS" DOCTRINE OF FLORIDA OR UNDER SOME RELATED SERVICES EXCEPTION.
5. WHETHER THE NEGLIGENT MISREPRESENTATION CLAIM IN THIS CASE PROVIDES AN EXCEPTION TO THE "ECONOMIC LOSS" DOCTRINE OF FLORIDA.
Indemnity Ins. Co. of N. America v. American Aviation, Inc., 344 F.3d 1136, 1148 (11th Cir.2003). We have jurisdiction. See art. V, § 3(b)(6), Fla. Const. For purposes of this opinion, we combine and rephrase the first two certified questions as follows:
WHETHER THE ECONOMIC LOSS DOCTRINE BARS A NEGLIGENCE ACTION TO RECOVER PURELY ECONOMIC LOSS IN A CASE WHERE THE DEFENDANT IS NEITHER A MANUFACTURER NOR DISTRIBUTOR OF A PRODUCT AND THERE IS NO PRIVITY OF CONTRACT.
For the reasons that follow, we answer the rephrased question in the negative. We conclude that the "economic loss doctrine" or "economic loss rule" bars a negligence action to recover solely economic damages only in circumstances where the parties are either in contractual privity or the defendant is a manufacturer or distributor of a product, and no established exception to the application of the rule applies. Because the defendant in this case is neither a manufacturer nor distributor of a product, and the parties are not in privity of contract, this negligence action is not barred by the economic loss rule. The remaining certified questions concerning exceptions to the economic loss doctrine are moot in light of our determination that the economic loss rule does not apply to this case.

FACTS AND PROCEDURAL HISTORY
This case arises from lawsuits filed by Indemnity Insurance Company of North America ("Indemnity") and Profile Aviation Services, Inc. ("Profile") against American Aviation, Inc. ("American") for damages to Profile's aircraft allegedly caused by negligent maintenance and inspection of the aircraft's landing gear. The specific claim of negligence was premised on the fact that the landing gear did *535 not extend because American had installed the lower thrust bearing of the right main actuator backwards.
The United States District Court for the Middle District of Florida dismissed Indemnity's and Profile's tort claims, finding them barred by Florida's economic loss rule. Indemnity and Profile appealed to the Eleventh Circuit Court of Appeals. In certifying the five questions to this Court, the Eleventh Circuit summarized the pertinent facts as follows:
This action arises from the allegedly negligent maintenance and inspection of an aircraft's landing gear by American. All mechanics who work on aircraft must be FAA-certified. To become certified, a mechanic must graduate from a certified aviation maintenance technical school (or have equivalent practical experience) and must pass a written test on the construction and maintenance of aircraft, the federal regulations, and provisions governing mechanics. They must also pass an oral and a practical skills test.
A FAA-certified mechanic who performs maintenance on an aircraft, airframe, engine, etc., must follow the methods, techniques, and practices prescribed in the aircraft's maintenance manual and perform the maintenance in such a manner that the condition of the aircraft will be at least equal to its original or properly altered condition. Moreover, when maintenance has been performed, a FAA-certified mechanic must give approval before the aircraft, airframe, etc., is returned to service. Before returning the aircraft to service, the certified mechanic must also make an entry into the aircraft's logbook regarding the inspection and maintenance performed. According to appellants, an aircraft owner relies on these records to determine, among other things, if the required maintenance has been performed, if the aircraft can be returned to service, and when the next maintenance is scheduled.
On or around November 22, 1996, American's FAA-certified mechanics, pursuant to a contract to which appellants are not parties, performed the required 30-month end play maintenance and inspection on the landing gear of a Beechcraft KingAir 100 aircraft ... ("Aircraft"). During the course of the inspection and repair, American's mechanics removed the Aircraft's right main landing gear actuator and lower thrust bearing. After completing the work, American's mechanics certified in the Aircraft's logbook that the work was done in accordance with the Aircraft's maintenance manual and FAA regulations.
Profile purchased the Aircraft subsequent to American's November 1996 maintenance and inspection. Appellants contend that they reasonably relied upon American's representations in the logbook concerning the November 1996 work. On May 14, 1999, the Aircraft was severely damaged when the right main landing gear failed to extend during a landing. The alleged cause of the failed landing gear was that the lower thrust bearing of the right main landing gear actuator was installed backwards. Appellants contend that they could not have discovered American's alleged negligence prior to the accident.
Proceedings in the District Court
On May 10, 2002, Indemnity, which was the Aircraft's insurer, and Profile filed separate four count complaints in the district court. Appellants sought to recover for negligence (Count I), negligence per se (Count II), negligent misrepresentation (Count III), and breach *536 of warranty (Count IV). American moved to dismiss the complaints, arguing that Florida's economic loss rule barred the tort claims and that no breach of warranty action could be maintained because of a lack of privity between appellants and American.
American Aviation, 344 F.3d at 1137-38 (citations and footnotes omitted).
The federal district court dismissed the tort claims with prejudice, but granted ten days to amend the breach of warranty claim to allege that Profile was an intended third-party beneficiary of the contract between American and the Aircraft's prior owner. Profile could not in good faith amend its complaint to allege intended third-party beneficiary status. Thus, both Profile and Infinity appealed only the dismissal of the tort claims to the Eleventh Circuit. Having doubt as to the correct application of Florida law under the facts of this case, the Eleventh Circuit certified the five questions of law to this Court.

ECONOMIC LOSS RULE
The economic loss rule is a judicially created doctrine that sets forth the circumstances under which a tort action is prohibited if the only damages suffered are economic losses.[1] However, because there has been much confusion about the scope of this doctrine, it is important to review its legal underpinnings. In this state, the economic loss rule has been applied in two different circumstances. The first is when the parties are in contractual privity and one party seeks to recover damages in tort for matters arising from the contract. The second is when there is a defect in a product that causes damage to the product but causes no personal injury or damage to other property.

A. Contractual Privity Economic Loss Rule
The prohibition against tort actions to recover solely economic damages for those in contractual privity is designed to prevent parties to a contract from circumventing the allocation of losses set forth in the contract by bringing an action for economic loss in tort. See, e.g., Ginsberg v. Lennar Fla. Holdings, Inc., 645 So.2d 490, 494 (Fla. 3d DCA 1994) ("Where damages sought in tort are the same as those for breach of contract a plaintiff may not circumvent the contractual relationship by bringing an action in tort."). Underlying this rule is the assumption that the parties to a contract have allocated the economic risks of nonperformance through the bargaining process. A party to a contract who attempts to circumvent the contractual agreement by making a claim for economic loss in tort is, in effect, seeking to obtain a better bargain than originally made. Thus, when the parties are in privity, contract principles are generally more appropriate for determining remedies for consequential damages that the parties *537 have, or could have, addressed through their contractual agreement. Accordingly, courts have held that a tort action is barred where a defendant has not committed a breach of duty apart from a breach of contract. See, e.g., Electronic Sec. Sys. Corp. v. Southern Bell Tel. & Tel. Co., 482 So.2d 518, 519 (Fla. 3d DCA 1986) (stating that "breach of contract, alone, cannot constitute a cause of action in tort . . . [and][i]t is only when the breach of contract is attended by some additional conduct which amounts to an independent tort that such breach can constitute negligence"); Weimar v. Yacht Club Point Estates, Inc., 223 So.2d 100, 103 (Fla. 4th DCA 1969) ("[N]o cause of action in tort can arise from a breach of a duty existing by virtue of contract.").
The application of this principle is best exemplified by this Court's decision in AFM Corp. v. Southern Bell Telephone & Telegraph Co., 515 So.2d 180 (Fla.1987). In that case, AFM entered into an agreement with Southern Bell Telephone and Telegraph Company that included placing AFM's advertising in the yellow pages. See id. at 180. However, Southern Bell listed an incorrect phone number for AFM, causing AFM economic damages. See id. In asserting a claim for economic losses, AFM chose to proceed solely on a negligence theory in the trial court below rather than base its theory of recovery on any agreement between the parties. See id. at 181. In determining that AFM could not recover economic losses based on a tort theory, this Court noted that AFM's contract with Southern Bell "defined the limitation of liability through bargaining, risk acceptance, and compensation." Id. Because AFM had not proved that Southern Bell committed a tort independent of the breach of contract, this Court concluded that AFM had no basis for recovery in negligence. See id.
Although parties in privity of contract are generally prohibited from recovering in tort for economic damages, we have permitted an action for such recovery in certain limited circumstances. One involves torts committed independently of the contract breach, such as fraud in the inducement. For example, in HTP, Ltd. v. Lineas Aereas Costarricenses, S.A., 685 So.2d 1238 (Fla.1996), this Court stated:
The economic loss rule has not eliminated causes of action based upon torts independent of the contractual breach even though there exists a breach of contract action. Where a contract exists, a tort action will lie for either intentional or negligent acts considered to be independent from the acts that breached the contract. Fraudulent inducement is an independent tort in that it requires proof of facts separate and distinct from the breach of contract.
Id. at 1239 (citations omitted); see also Pershing Indus., Inc. v. Estate of Sanz, 740 So.2d 1246, 1248 (Fla. 3d DCA 1999) (claims for economic damage based on fraud in the inducement, conversion, and civil theft were independent torts and thus actionable despite existence of contract between the parties). Another situation involves cases such as those alleging neglect in providing professional services, in which this Court has determined that public policy dictates that liability not be limited to the terms of the contract. See, e.g., Moransais v. Heathman, 744 So.2d 973, 983 (Fla.1999) ("While provisions of a contract may impact a legal dispute, including an action for professional services, the mere existence of such a contract should not serve per se to bar an action for professional malpractice.").

B. Products Liability Economic Loss Rule
In contrast to the contractual privity economic loss rule, which developed to protect *538 the integrity of the contract, the products liability economic loss rule developed to protect manufacturers from liability for economic damages caused by a defective product beyond those damages provided for by warranty law. Early in the common law, an innocent third party who purchased a product from a retailer or distributor could not sue the manufacturer for personal injuries sustained, even as the result of the intended use of the product, because of the absence of privity of contract with the manufacturer. See Matthews v. Lawnlite Co., 88 So.2d 299, 300 (Fla.1956) (noting that "the early common law rule . . . inhibited recovery [from a manufacturer of a product] where there was absence of privity of contract"). However, in this jurisdiction and others, "[a] doctrine more in line with reason and justice" emerged that imposed liability on a manufacturer for personal injury caused by the manufacturer's failure to exercise reasonable care in the adoption of a safe plan or design for a product placed in the stream of commerce, regardless of privity. See id.[2] The negligence standard of reasonable care, which initially measured the manufacturer's liability for injury to person or property, eventually evolved into the doctrine of strict liability. See, e.g., West v. Caterpillar Tractor Co., 336 So.2d 80, 89 (Fla.1976) (adopting the theory of strict products liability in Florida).
The doctrine of strict products liability had its origins in the landmark case of Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69 (1960), involving a defective automobile that crashed and caused property damage and personal injury. Although the parties were not in contractual privity, the New Jersey Supreme Court concluded that the plaintiffs had a cause of action based on breach of implied warranty of fitness. Henningsen, 161 A.2d at 69. The New Jersey court stated that "under modern marketing conditions, when a manufacturer puts a new automobile in the stream of trade and promotes its purchase by the public, an implied warranty that it is reasonably suitable for use as such accompanies it into the hands of the ultimate purchaser." Id. Although couched in terms of an implied warranty of fitness, the Henningsen holding created the foundation for what would become the doctrine of strict products liability in tort. See Spring Motors Distribs., Inc. v. Ford Motor Co., 98 N.J. 555, 489 A.2d 660, 666 (1985) (recognizing that Henningsen established the theory of strict products liability).
Eventually, others courts recognized that any theory of recovery premised on warranty doctrine was insufficient to protect consumers from physical injury as a result of defective products. See West, 336 So.2d at 92. Indeed, in West, we explained:
[W]e recognize that in the present day marketing milieu treatment of the manufacturers' liability to ultimate purchasers or consumers in terms of implied warranty is simply using a convenient legal device to accomplish some recourse for an injured person. . . . Ordinarily there is no contract in a real sense between a manufacturer and an ultimate consumer of its product. . . .
The obligation of the manufacturer must become what in justice it ought *539 to be  an enterprise liability, and one which should not depend upon the intricacies of the law of sales.
Id. Based on this rationale, the doctrine of strict products liability was adopted in Florida.
In Kramer v. Piper Aircraft Corp., 520 So.2d 37, 39 (Fla.1988), we recognized that, in the absence of privity, the cause of action for breach of implied warranty did not survive the holding in West. In other words, the doctrine of strict liability replaced all no-privity, breach of implied warranty liability. However, a cause of action for breach of implied warranty remains available where the parties are in privity of contract. See id.; see also Seely v. White Motor Co., 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145, 149 (1965) ("Final recognition that `[t]he remedies of injured consumers ought not to be made to depend upon the intricacies of the law of sales' caused . . . court[s] to abandon the fiction of warranty in favor of strict liability in tort.") (citations omitted).
As the theory of strict liability replaced the theory of implied warranties with regard to actions based on defective products that resulted in personal injury, the issue arose as to whether the courts should permit a cause of action in tort by one who suffered purely economic loss due to a defective product. For those who were in contractual privity, actions based on breach of warranty continued as the viable method if the only damages were economic in nature. But for those who were not in contractual privity and who sustained economic losses as a result of defective products, the question became what theory of recovery would be proper.
The California Supreme Court's decision in Seely was the landmark case that held that the doctrine of strict liability in tort had not supplanted causes of action for breach of express warranty. In that case, the court was confronted with a situation in which a plaintiff sought recovery for economic loss resulting from his purchase of a truck that failed to perform according to his expectations. See Seely, 45 Cal.Rptr. 17, 403 P.2d at 149. The California Supreme Court agreed with the trial court that the defendant could recover the money he paid on the purchase price of the truck and for his lost profits on the basis of breach of express warranty, see id., 45 Cal.Rptr. 17, 403 P.2d at 148, but rejected the argument that warranty law had been superseded by the doctrine of strict liability. See id., 45 Cal.Rptr. 17, 403 P.2d at 149. The Court concluded that the strict liability doctrine was not intended to undermine the warranty provisions of sales or contract law but, rather, was designed to govern the wholly separate and distinct problem of physical injuries caused by defective products. See id., 45 Cal.Rptr. 17, 403 P.2d at 149-50.
According to the court, "[t]he fact that the warranty theory was not suited to the field of liability for personal injuries, however, does not mean that it has no function at all." Id., 45 Cal.Rptr. 17, 403 P.2d at 149. The court recognized that the rules of warranty continued to function well in a commercial setting, allowing the manufacturer to determine the quality of the product and the scope of its liability if the product fails to perform. The California Supreme Court reasoned that a manufacturer's liability under that theory would extend to all subsequent purchasers regardless of whether the manufacturer's promise regarding the fitness of the product was ever communicated to those purchasers. If a manufacturer were strictly liable for economic losses resulting from the failure of its product to perform as promised by the warranty, it would be liable not only to the initial purchaser, but to every consumer who subsequently obtained *540 possession of the product. See id., 45 Cal.Rptr. 17, 403 P.2d at 150.
The California Supreme Court further reasoned that the law of warranty should function to prevent a liability of unknown and unlimited scope:
The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the "luck" of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands. A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will. Even in actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone.
Id., 45 Cal.Rptr. 17, 403 P.2d at 151 (emphasis supplied). Hence, the Court recognized the continuing utility of warranty law in cases involving economic loss to the product.
When the United States Supreme Court subsequently considered the issue of economic loss resulting from defective products in the context of admiralty, the Court adopted the reasoning of Seely. See East River Steamship Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 871, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). According to the Supreme Court, when the damage is to the product itself, "the injury suffered  the failure of the product to function properly  is the essence of a warranty action, through which a contracting party can seek to recoup the benefit of its bargain." Id. at 868, 106 S.Ct. 2295 (emphasis supplied). The Court stated:
Contract law, and the law of warranty in particular, is well suited to commercial controversies of the sort involved in this case because the parties may set the terms of their own agreements. The manufacturer can restrict its liability, within limits, by disclaiming warranties or limiting remedies. In exchange, the purchaser pays less for the product.
Id. at 872-73, 106 S.Ct. 2295 (emphasis supplied) (footnote and citation omitted). Recognizing that extending strict products liability to cover economic damage would result in "contract law . . . drown[ing] in a sea of tort," id. at 866, 106 S.Ct. 2295, the Supreme Court held that "a manufacturer in a commercial relationship has no duty under either negligence or strict products-liability to prevent a product from injuring itself." Id. at 871, 106 S.Ct. 2295.
Relying on Seely and East River, this Court adopted the products liability economic loss rule in Florida Power & Light Co. v. Westinghouse Electric Corp., 510 So.2d 899, 902 (Fla.1987). Florida Power & Light (FPL) entered into contracts with Westinghouse in which Westinghouse agreed to design, manufacture, and furnish two nuclear steam supply systems, including six steam generators. FPL discovered leaks in all six generators. FPL brought suit, alleging that Westinghouse was liable for breach of express warranties in the contracts and for negligence, and seeking *541 damages for the cost of repair, revision, and inspection of the steam generators. Id. at 900.
In determining whether Florida law permitted FPL to recover the economic losses in tort without a claim for personal injury or separate property damage, this Court considered the policy issues supporting the application of a rule that limits tort recovery for economic losses when a product damages itself. Id. Concluding that warranty law was more appropriate than tort law for resolving economic losses in this context, the Court adopted the holding in East River that "a manufacturer in a commercial relationship has no duty under either a negligence or strict products liability theory to prevent a product from injuring itself." Florida Power, 510 So.2d at 901 (quoting East River, 476 U.S. at 871, 106 S.Ct. 2295).
The economic loss rule adopted in Florida Power represents this Court's pronouncement that, notwithstanding the theory of strict liability adopted in West, strict liability has not replaced warranty law as the remedy for frustrated economic expectations in the sale of goods. In exchange for eliminating the privity requirements of warranty law and expanding the tort liability for manufacturers of defective products which cause personal injury, we expressly limited tort liability with respect to defective products to injury caused to persons or damage caused to property other than the defective product itself. In this regard, we also note that the products liability economic loss rule articulated in Seely and East River, and adopted by this Court in Florida Power, applies even in the absence of privity of contract. See Airport Rent-A-Car, Inc. v. Prevost Car, Inc., 660 So.2d 628, 631 (Fla.1995) (holding cause of action for negligence against manufacturer of defective buses was barred by the economic loss rule notwithstanding absence of privity); Casa Clara Condo. Ass'n, Inc. v. Charley Toppino & Sons, Inc., 620 So.2d 1244, 1248 (Fla.1993) (holding cause of action against manufacturer of defective concrete was barred by the economic loss rule notwithstanding absence of privity).

THIS CASE
This case does not involve a cause of action against a manufacturer or distributor for economic loss caused by a product which damages itself. Thus, the products liability economic loss rule is inapplicable. Nor does this case involve parties who enjoy privity of contract. Thus, the economic loss rule for those in privity of contract is inapplicable. Rather, this case involves plaintiffs who claim economic loss caused by the alleged negligence of a defendant with whom the plaintiffs were not in privity.
Palau International Traders, Inc. v. Narcam Aircraft, Inc., 653 So.2d 412 (Fla. 3d DCA 1995), involved application of the economic loss rule under similar facts. In Palau International, a purchaser of a used airplane brought a negligence action against an airplane mechanic with whom it had no privity of contract. See id. at 413. The buyer and seller had entered into a contract of sale that provided that at the time of delivery and closing of the sale the aircraft would have a current "United States' FAA Certificate of Airworthiness." Id. The seller hired a mechanic to repair and inspect the plane in an effort to obtain an airworthiness certificate from the FAA. See id. at 414. The mechanic completed the application for the certificate and verified that the plane had been inspected and found airworthy. The FAA subsequently issued the airworthiness certificate. However, six months later, the buyer discovered that the landing gear was cracked and filed suit against the mechanic, alleging *542 that the condition existed at the time the mechanic conducted its inspection. See id. The Third District affirmed the trial court's order granting the mechanic summary judgment based on the economic loss rule. See id. at 418.
Having reviewed the origin and purpose of the economic loss rule, we conclude that it should not be extended to the type of claim presented in Palau International and this case. In Moransais, we recognized the danger in an "unprincipled extension of the rule." 744 So.2d at 981. We stated that those situations in which this Court had permitted recovery for purely economic loss, such as in the context of fraudulent inducement and negligent misrepresentation,
serve[d] as reminders of the distinct limitations of the economic loss rule. Today, we again emphasize that by recognizing that the economic loss rule may have some genuine, but limited, value in our damages law, we never intended to bar well-established common law causes of action, such as those for neglect in providing professional services. Rather, the rule was primarily intended to limit action in the product liability context, and its application should generally be limited to those contexts or situations where the policy considerations are substantially identical to those underlying the product liability-type analysis.
Id. at 983 (footnote omitted). Although we limited our holding in Moransais to situations involving professional malpractice, we note that some courts have extended the exception to the application of the economic loss rule created in Moransais to causes of action for breach of fiduciary duty, even if there was an underlying oral or written contract. See Invo Fla., Inc. v. Somerset Venturer, Inc., 751 So.2d 1263, 1266 (Fla. 3d DCA 2000); Performance Paint Yacht Refinishing, Inc. v. Haines, 190 F.R.D. 699, 701 (S.D.Fla.1999).
Several justices on this Court have supported expressly limiting the economic loss rule to its principled origins. In Moransais, Justice Wells stated "directly that it is [his] view that the economic loss rule should be limited to cases involving a product which damages itself by reason of a defect in the product." Moransais, 744 So.2d at 984 (Wells, J., concurring). Two justices subsequently joined Justice Wells when he reiterated this position in Comptech International, Inc. v. Milam Commerce Park, Ltd., 753 So.2d 1219 (Fla.1999). See id. at 1227 (Wells, J., concurring with an opinion in which Justices Lewis and Pariente joined).
We now agree that the economic loss rule should be expressly limited. First, we reiterate that when the parties have negotiated remedies for nonperformance pursuant to a contract, one party may not seek to obtain a better bargain than it made by turning a breach of contract into a tort for economic loss. Our holding in AFM Corp. illustrates this well-settled rule of law. However, because it may appear that AFM Corp. also expanded the products liability economic loss rule, we recede from AFM Corp. to the extent that it relied on the principles adopted by this Court in Florida Power. As we recognized in Moransais, AFM Corp. was "unnecessarily over-expansive in [its] reliance on the economic loss rule as opposed to fundamental contractual principles." Moransais, 744 So.2d at 981.
Second, consistent with the original rationale and intent of Seely, East River, and Florida Power, we hold that a manufacturer or distributor in a commercial relationship has no duty beyond that arising from its contract to prevent a product from malfunctioning or damaging itself. *543 [3] In other words, we reaffirm our recognition of the products liability economic loss rule. However, we expressly note that the "other property" exception to the products liability economic loss rule remains viable. Indeed, as the United States Supreme Court noted in East River, "[i]n the traditional `property damage' cases, the defective product damages other property," and "[s]uch damage is considered so akin to personal injury that the two are treated alike." East River, 476 U.S. at 867, 106 S.Ct. 2295; see also Comptech, 753 So.2d at 1219 (concluding that computers placed in the warehouse were not an integral part of the product and were therefore "other property"); Southland Constr., Inc. v. Richeson Corp., 642 So.2d 5 (Fla. 5th DCA 1994) (concluding that "other structures" not involved in the building project that were damaged by the failure of the retaining wall, i.e., the adjoining pool deck and a different wall, were other property).
We also reaffirm that in cases involving either privity of contract or products liability, the other exceptions to the economic loss rule that we have developed, such as for professional malpractice,[4] fraudulent inducement,[5] and negligent misrepresentation,[6] or freestanding statutory causes of action, still apply.[7] These exceptions remain untouched by our ruling today.
We further conclude that, in general, actionable conduct that frustrates economic interests should not go uncompensated solely because the harm is unaccompanied by any injury to a person or other property. We therefore hold that cases that do not fall into either of the two categories articulated above should be decided on traditional negligence principles of duty, breach, and proximate cause. That said, we express no opinion on the existence of a cause of action or the appropriateness of recovery for certain types of economic damages in individual cases. We also decline to make any per se distinction between damages for direct economic injury, such as the loss of the benefit of the bargain, and consequential economic damages, such as lost profits.

CONCLUSION
In conclusion, we answer the first and second certified questions as rephrased herein in the negative, and decline to address the remaining certified questions, as our holding herein renders those questions moot. As noted above, neither the products liability nor the contract economic loss rules apply to this case. Rather, in this case, Profile and Infinity have alleged that American Aviation was negligent in maintaining and inspecting an aircraft subsequently purchased by Profile. If American Aviation owed Profile a duty, then Profile is not prevented from recovering *544 for purely economic injuries. We return this case to the Eleventh Circuit for disposition consistent with this opinion. We further disapprove the Third District's decision in Palau International to the extent it is inconsistent with this opinion.
It is so ordered.
WELLS, ANSTEAD, LEWIS, QUINCE, CANTERO and BELL, JJ., concur.
CANTERO, J., concurs with an opinion, in which WELLS, J., concurs.
CANTERO, J., concurring.
I concur in the majority opinion. I write separately to emphasize two points: (1) by our opinion today we not only make the economic loss rule sounder in principle and easier in application, but we also bring Florida more into line with the majority of jurisdictions that have adopted such a rule; and (2) our limitation of the rule will not open the gates to widespread tort recovery for purely economic losses. As the majority recognizes, plaintiffs whose cases fall outside of the economic loss rule must still prove "duty, breach, and proximate cause." Majority op. at 543. The "duty" prong remains a strong filter in these cases.
I discuss these concepts in turn.

1. Simplification of Economic Loss Rule
The economic loss rule has become a confusing morass. As more than one court has lamented, the rule has been "stated with ease but applied with great difficulty." Delgado v. J.W. Courtesy Pontiac GMC-Truck, Inc., 693 So.2d 602, 606 (Fla. 2d DCA 1997) (quoting Sandarac Ass'n v. W.R. Frizzell Architects, Inc., 609 So.2d 1349, 1352 (Fla. 2d DCA 1992)). We, too, have "acknowledge[d] that our prior pronouncements on the [economic loss] rule have not always been clear, and, accordingly, have been the subject of legitimate criticism and commentary." Moransais v. Heathman, 744 So.2d 973, 980 (Fla.1999); see also Comptech Int'l, Inc. v. Milam Commerce Park, Ltd., 753 So.2d 1219, 1223-24 (Fla.1999) (recognizing "the confusion that has abounded in this area of the law"). Apparently due to this confusion, and because we have never applied the economic loss rule to a case involving both the provision of services and lack of privity, the Eleventh Circuit Court of Appeals in this case believed that no controlling precedent existed, and it certified several questions. I hope that our restriction of the rule will reduce some of the confusion.
The Court today limits the economic loss rule to situations "where the parties are either in contractual privity or the defendant is a manufacturer or distributor of a product, and no established exception to the application of the rule applies." Majority op. at 534. Stated negatively, the economic loss rule does not apply in the services context unless a contract exists and none of the established exceptions to the rule apply.[8]
I agree with this limitation of the rule. As the majority recognizes, the central purpose of the economic loss rule is "to protect the integrity of the contract," Majority op. at 538, and thereby to prevent contract law and warranty law from "drown[ing] in a sea of tort." East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 866, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) (citing Grant Gilmore, The Death of Contract 87-94 (1974)). When parties can protect their economic interests through contract, it would only undermine contract and warranty law and *545 produce economic inefficiency to allow purely economic recovery in tort. See Alloway v. Gen. Marine Indus., L.P., 149 N.J. 620, 695 A.2d 264, 275 (1997) ("[A] tort cause of action for economic loss duplicating the [causes of action] provided by the U.C.C. is superfluous and counterproductive."). It is doubtful, however, that parties can protect their economic interests through contract when they have not contracted with each other and when the basis of their indirect relationship is not a tangible product, but rather an intangible service. See Congregation of the Passion, Holy Cross Province v. Touche Ross & Co., 159 Ill.2d 137, 201 Ill.Dec. 71, 636 N.E.2d 503, 515 (1994) ("The characteristics of a tangible object are readily ascertainable, and they can be memorialized in a contract and studied by the parties. . . . It is not necessary or generally possible to memorialize all the elements of [a service] contract. . . . Application of the [economic loss rule], therefore, is inappropriate where a relationship results in something intangible."). In such circumstances, the parties often lack a sufficient nexus through which to allocate economic risks. Indeed, they might not even know of their indirect relationship.
I note that restricting the rule's application does not place Florida at odds with other states. To the contrary, it places Florida squarely in the mainstream. The vast majority of states restrict the rule to products cases, at least in the absence of a contract. See, e.g., Ins. Co. of N. America v. Cease Elec. Inc., 688 N.W.2d 462, 472 (Wis.2004) (holding as a "bright line rule" that "the economic loss doctrine is inapplicable to claims for the negligent provision of services"); Congregation of the Passion, 201 Ill.Dec. 71, 636 N.E.2d at 514 (stating that the economic loss rule applies to services relationships "only where the duty of the party performing the service is defined by the contract that he executes with his client"); McCarthy Well Co. v. St. Peter Creamery, Inc., 410 N.W.2d 312, 315 (Minn.1987) (holding that the economic loss rule does not apply "if the predominant purpose of the contract is the rendition of services").[9] Few states apply the *546 rule as broadly to services rendered as to products purchased. See Ramerth v. Hart, 133 Idaho 194, 983 P.2d 848, 851 (1999) (applying the economic loss rule to the "repair and inspection" of an airplane despite the absence of privity, and stating that the rule "applies to negligence cases in general; its application is not restricted to products liability cases").[10]
Our simplification of the rule to cases involving either defective products or a contractual relationship places Florida in the mainstream of jurisdictions applying the economic loss rule.

2. The Duty Element
Limiting the scope of the economic loss rule removes one obstacle to the recovery of purely economic losses. But significant obstacles remain. As the majority recognizes, plaintiffs whose cases fall outside of the economic loss rule must still satisfy "the traditional negligence principles of duty, breach, and proximate cause." Majority op. at 543. The "duty" prong remains a strong filter in these cases  virtually as strong as the rule itself. A service provider's mere failure to exercise reasonable care in performing a service contract does not render it liable in tort to every party who loses revenue or incurs additional expense. The plaintiff still must demonstrate an independent duty to protect that plaintiff's purely economic interests. See Onita Pac. Corp. v. Trs. of Bronson, 315 Or. 149, 843 P.2d 890, 896 (1992) (holding that a "negligence claim for the recovery of economic losses caused by another must be predicated on some duty of the negligent actor to the injured party beyond the common law duty to exercise reasonable care to prevent foreseeable harm"). Such a showing will be difficult in most cases.
Illinois's experience is instructive. In Congregation of the Passion, 201 Ill.Dec. 71, 636 N.E.2d at 514, the Illinois Supreme Court did roughly what the majority does today: it limited the application of the economic loss rule in the services context to cases "where the duty of the party performing the service is defined by contract." *547 Id. After Congregation of the Passion, however, Illinois courts quickly recognized that the "duty" element plays a filtering role similar to that of the economic loss rule. As one Illinois appellate court noted,
"[T]he concept of duty is at the heart of the distinction drawn by the economic loss rule. The rule acts as a shorthand means of determining whether a plaintiff is suing for injuries arising from the breach of a contractual duty ... or for injuries resulting from the breach of a duty arising independently of the contract ..."
Tolan & Son, Inc. v. KLLM Architects, Inc., 308 Ill.App.3d 18, 241 Ill.Dec. 427, 719 N.E.2d 288, 294 (1999) (quoting 2314 Lincoln Park West Condo. Ass'n v. Mann, Gin, Ebel & Frazier, Ltd., 136 Ill.2d 302, 144 Ill.Dec. 227, 555 N.E.2d 346, 351-52 (1990)). Thus, even without the economic loss rule, Illinois courts continue to deny relief to most plaintiffs seeking purely economic losses because they generally cannot prove a breach of a duty independent of the contract. See, e.g., Harger v. Spirit Airlines, Inc., No. 01-C-8606, 2003 WL 21218968, at *10 (N.D.Ill. May 22, 2003) (finding no independent duty on the part of an airline to transport passenger bags safely to their destination, because any such duty is merely "incidental" to the contract); Peter J. Hartmann Co. v. Capital Bank & Trust Co., 296 Ill.App.3d 593, 230 Ill.Dec. 830, 694 N.E.2d 1108 (1998) (finding that any duties of a subcontractor to a property owner were merely "incidental to [the subcontractor's] contractual duty").
Courts have considered allowing recovery from service providers for purely economic loss where a special or fiduciary relationship exists. See, e.g., Mut. Serv. Cas. Ins. Co. v. Elizabeth State Bank, 265 F.3d 601 (7th Cir.2001) (applying Illinois law) (concluding that a bank's handling of its customers' transactions might create independent tort duties); Choi v. Chase Manhattan Mortgage Co., 63 F.Supp.2d 874, 884 (N.D.Ill.1999) (holding that independent tort duties might exist "where one party, due to a close relationship, relies heavily on the judgment of another").
The experience of Illinois suggests that our limitation of the economic loss rule in the services context will not open up a brave new world of tort liability because the duty element will continue to weed out most claims for purely economic loss. Even the strongest advocates of limiting the economic loss rule in Florida have recognized this. See Paul J. Schwiep, The Economic Loss Rule Outbreak: The Monster That Ate Commercial Torts, Fla. Bar J., Nov. 1995, at 34, 42 ("The duty-analysis, had it been employed [in this Court's previous] cases, may very well have led to the same final outcome [as the economic loss rule]  the facts aren't clear. The point of this article is not to criticize the result, but to urge rigor in the analysis.").

CONCLUSION
The practical effect of today's decision in terms of overall tort liability should be unremarkable. Although the economic loss rule no longer applies in the services context in the absence of a contract, the duty element of traditional negligence claims should continue to filter out the undeserving claims previously barred by the economic loss rule. The Court does nothing to alter the underlying causes of action on which recovery for purely economic losses may be based. Majority op. at 543 ("[W]e express no opinion on the existence of a cause of action or the appropriateness *548 of recovery for certain types of economic damages in individual cases."). Rather, it merely ensures that deserving claims for purely economic recovery in tort  exceptional though they may be  will not be swallowed by an over-inclusive rule. Therefore, I concur.
WELLS, J., concurs.
NOTES
[1] Economic losses are, simply put, disappointed economic expectations. In Casa Clara Condominium Association, Inc. v. Charley Toppino & Sons, Inc., 620 So.2d 1244 (Fla.1993), we explained that economic loss has been defined as "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits." Id. at 1246 (quoting Note, Economic Loss in Products Liability Jurisprudence, 66 Colum. L.Rev. 917, 918 (1966)). In the specific context of products liability, economic loss includes "the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which is was manufactured or sold." Id. (quoting Comment, Manufacturers' Liability to Remote Purchasers for "Economic Loss" Damages  Tort or Contract?, 114 U. Pa. L.Rev. 539, 541 (1966)). Economic loss has also been defined more broadly as the loss of the "benefit of his bargain." Id. (quoting Redarowicz v. Ohlendorf, 92 Ill.2d 171, 65 Ill.Dec. 411, 441 N.E.2d 324, 327 (1982)).
[2] The seminal decision recognizing this theory of liability is MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050 (1916), in which the New York Court of Appeals refused to apply the privity requirement to bar recovery in an action brought by a driver of an automobile for injuries caused by a defective wheel the automobile manufacturer had negligently failed to inspect.
[3] Intentional tort claims such as fraud, conversion, intentional interference, civil theft, abuse of process, and other torts requiring proof of intent generally remain viable either in the products liability context or if the parties are in privity of contract. As noted by one commentator, a rule barring recovery for economic loss "is not an escape hatch from intentional commercial torts." Paul J. Schwiep, The Economic Loss Rule Outbreak: The Monster that Ate Commercial Torts, Fla. B. J., Nov. 1995, at 34, 42.
[4] Moransais, 744 So.2d at 983.
[5] See HTP, Ltd., 685 So.2d at 1239.
[6] See PK Ventures, Inc. v. Raymond James & Assocs., 690 So.2d 1296, 1297 (Fla.1997); First Florida Bank, N.A. v. Max Mitchell & Co., 558 So.2d 9, 15-16 (Fla.1990); First American Title Ins. Co. v. First Title Serv. Co., 457 So.2d 467, 473 (Fla.1984).
[7] See Comptech, 753 So.2d at 1221.
[8] For example, our holding does not supplant the exception for professional services created in Moransais, 744 So.2d at 983. Majority op. at 543.
[9] Many states implicitly restrict the rule to products liability cases. These include Alabama, see Lloyd Wood Coal Co. v. Clark Equip. Co., 543 So.2d 671, 673-74 (Ala.1989) (stating that the rule applies to products liability cases involving manufacturers); California, see Jimenez v. Super. Court, 29 Cal.4th 473, 127 Cal.Rptr.2d 614, 58 P.3d 450, 456 (2002) (limiting the rule to cases involving "strict products liability . . . when a product defect causes damage" to the product itself); Delaware, see Danforth v. Acorn Structures, Inc., 608 A.2d 1194, 1198 (Del.1992) (stating that the rule bars "the recovery of economic loss caused by qualitatively defective products"); Georgia, see Vulcan Materials Co. v. Driltech, Inc., 251 Ga. 383, 306 S.E.2d 253, 257 (1983) (stating that the rule applies "when a defective product has resulted in the loss of the value or use of the thing sold"); Hawaii, see State ex rel. Bronster v. U.S. Steel Corp., 82 Hawai'i 32, 919 P.2d 294, 302 (1996) (adopting the rule "insofar as it applies to claims for relief based on a product liability or negligent design and/or manufacture theory"); Maine, see Oceanside at Pine Point Condo. Owners Ass'n v. Peachtree Doors, Inc., 659 A.2d 267, 270 (Me.1995) (applying the rule to bar "recovery for a defective product's damage to itself"); Maryland, see Morris v. Osmose Wood Preserving, 340 Md. 519, 667 A.2d 624, 632-33 (1995) (characterizing the rule as a products liability rule); Massachusetts, see Berish v. Bornstein, 437 Mass. 252, 770 N.E.2d 961, 975 (2002) (holding that the rule applies "to the purchase and sale of products [and] also to claims of negligent design and installation in a newly constructed home"); Michigan, see Neibarger v. Universal Coops., Inc., 439 Mich. 512, 486 N.W.2d 612, 615 (1992) (limiting the rule to "transactions involving the sale of goods for commercial purposes where economic expectations are protected by commercial and contract law"); Missouri, see Sharp Bros. Contracting Co. v. Am. Hoist & Derrick Co., 703 S.W.2d 901, 903 (Mo.1986) (applying the rule to cases "where the only damage is to the product sold"); Nebraska, see Nat'l Crane Corp. v. Ohio Steel Tube Co., 213 Neb. 782, 332 N.W.2d 39, 44 (1983) (holding that "the purchaser of a product pursuant to a contract cannot recover [purely] economic losses from the seller manufacturer on claims in tort based on negligent manufacture or strict liability"); New Jersey, see Alloway, 695 A.2d at 267 (stating that the rule applies to "claims arising out of the manufacture, distribution, and sale of defective products"); New York, see 532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc., 96 N.Y.2d 280, 727 N.Y.S.2d 49, 750 N.E.2d 1097, 1101 n. 1 (2001) (stating that the rule applies to suits by "an end-purchaser of a product" against a manufacturer); North Carolina, see Moore v. Coachmen Indus., Inc., 129 N.C.App. 389, 499 S.E.2d 772, 780 (1998) (defining the rule in products liability terms); North Dakota, see Hagert v. Hatton Commodities, Inc., 350 N.W.2d 591, 595 (N.D.1984) (same); Oklahoma, see Okla. Gas & Elec. Co. v. McGraw-Edison Co., 834 P.2d 980, 982 (Okla.1992) (stating that the rule applies to "manufacturers' products liability"); South Carolina, see Beachwalk Villas Condo. Ass'n v. Martin, 305 S.C. 144, 406 S.E.2d 372, 374 n. 1 (1991) (stating that the rule applies only to product defect cases in which the "duties are created solely by contract"); and South Dakota, see Diamond Surface, Inc. v. State Cement Plant Comm'n, 583 N.W.2d 155, 161 (S.D.1998) (stating that the rule applies when the "predominate purpose" of a transaction is the "sale of goods").
[10] See also Springfield Hydroelectric Co. v. Copp, 172 Vt. 311, 779 A.2d 67, 71 (2001) (stating that "the economic loss rule clearly applies to commercial disputes outside the confines of product liability"); Neb. Innkeepers, Inc. v. Pittsburgh-Des Moines Corp., 345 N.W.2d 124, 126 (Iowa 1984) (stating broadly that "[t]he well-established general rule is that a plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable").