FILED
09/28/2023
Clerk of the
Appellate Courts

IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
November 9, 2022 Session

## COMMERCIAL PAINTING COMPANY INC. v. THE WEITZ COMPANY LLC ET AL.

**Appeal by Permission from the Court of Appeals
Chancery Court for Shelby County
No. CH-06-1573     JoeDae L. Jenkins, Chancellor**

———————————————————————

**No. W2019-02089-SC-R11-CV**

———————————————————————

SARAH K. CAMPBELL, J., with whom JEFFREY S. BIVINS, J., joins, dissenting.

The economic-loss doctrine bars recovery in tort for purely economic losses in certain situations. In this case, the Court is asked to apply that doctrine to bar tort claims brought by a subcontractor against a general contractor, where the relationship between the subcontractor and general contractor is governed by a contract. The majority opinion cabins the economic-loss doctrine to products liability cases and refuses to extend it to contracts for services for fear that doing so would require that we also create various exceptions. I respectfully disagree with that holding. The core rationale underlying the economic-loss doctrine—to create a boundary line between tort and contract law to ensure that parties can allocate risks and responsibilities as they see fit—applies equally to cases involving contracts for services. And to the extent that any exceptions to the rule would be needed, their creation would not be nearly as difficult or messy as the majority predicts. I would hold that the economic-loss doctrine applies here and precludes the subcontractor from recovering punitive damages and pre-judgment interest.

I.

This appeal arises from a decades-old dispute between a general contractor—The Weitz Company, LLC—and its drywall subcontractor—Commercial Painting Company, Inc.—during the construction of a retirement community in Shelby County. Weitz is a large commercial contractor that, at the time of the project, was the largest builder of continuing-care retirement communities in the country. Commercial Painting had a staff of thirty-five employees.

In 2004, Weitz and Commercial Painting executed a standard form subcontract agreement related to the Shelby County project. Commercial Painting's president reviewed

the subcontract terms in detail, initialing each page, and requested a number of changes to certain parts of the subcontract, including the scope of work provisions. The agreement provided that Commercial Painting would be paid $3.22 million for proper performance.

The subcontract incorporated the plans and specifications for the project and addressed in detail the scope of Commercial Painting's work, the project schedule, available remedies, attorney's fees, and myriad other items. Of particular relevance here, the subcontract provided that Commercial Painting "shall be entitled to an extension of the Subcontract Time and/or reimbursement for delay damages only to the extent that [Weitz] actually receives an extension of time and/or reimbursement for delay damages under the Prime Contract for events pertaining to [Commercial Painting's] Work." With the exception of those pass-through rights, Commercial Painting "waive[d] and release[d] [Weitz] from any and all [c]laims for such delay damages, including without limitation [c]laims attributable to breach of contract or tort."

In a provision titled "Contract Terms Control," the subcontract further stated that Weitz would "[i]n no event . . . be obligated to pay [Commercial Painting] any anticipatory profit or indirect, special or consequential damages, however caused" and made clear that Commercial Painting was "waiv[ing] all such [c]laims." In the same provision, Commercial Painting "specifically agree[d] that it shall not be entitled to assert . . . any [c]laims in quantum meruit, interest on late payments, or any other measure of damages other than as specifically provided" in certain other provisions of the subcontract.

The subcontract detailed whether and when Weitz and Commercial Painting could modify the scope of Commercial Painting's work or the amounts owed under the subcontract. For example, the subcontract expressly permitted Weitz to charge Commercial Painting for the cost of any "additional services . . . required . . . to assist [Commercial Painting] in performing its obligations" under the subcontract, including "supplemental manpower." And it entitled Commercial Painting to payment for additional work only as "properly authorized" by Weitz.

As for the schedule, the subcontract obligated Commercial Painting to "meet or better the durations established in [Weitz's] [s]chedule" but also provided that the schedule would be "updated periodically to reflect actual job progress." Commercial Painting was required to "provide sufficient crews, materials and equipment to maintain or improve upon [Weitz's] [s]chedule." Weitz, meanwhile, had "the right to suspend [Commercial Painting's] performance from time to time, or to reschedule or re-sequence [its] [w]ork."

Weitz was already more than eight months behind schedule when the subcontract was executed. Although Weitz was aware of the delay, it did not share that information with Commercial Painting before entering the subcontract and instead included an outdated construction schedule as an exhibit to the subcontract.

Trouble began soon after Commercial Painting started work on the project. Because of pre-existing delays and slow progress by other subcontractors, Commercial Painting struggled to comply with the performance schedule set by Weitz. Weitz hired additional workers to supplement Commercial Painting's work. Weitz also issued "notices to comply" to Commercial Painting, claiming that Commercial Painting was failing to perform a "Level 4" drywall finish even though the subcontract required only a "Level 3" finish. By the end of the project, Weitz had withheld more than half a million dollars in payments to Commercial Painting for "supplementation charges and supervision charges." And it refused Commercial Painting's requests for additional compensation related to extra work necessitated by the poor performance of other subcontractors. The project was not completed until February 2006.

Commercial Painting sued Weitz and various other defendants in late 2004.[1] The operative complaint for purposes of this appeal—Commercial Painting's second amended complaint—asserted breach of contract and tort claims, including negligent and intentional misrepresentation and unjust enrichment claims against Weitz.[2] Commercial Painting alleged that it had fully performed the subcontract and that Weitz had breached the agreement by failing to pay in full. It further alleged that Weitz had made material misrepresentations by failing to inform Commercial Painting that the project schedule would be compressed or that it would supplement Commercial Painting's drywall work with other subcontractors. Commercial Painting sought compensatory damages of nearly $2 million plus pre-judgment interest and attorney's fees, along with punitive damages of $200 million.

Weitz counterclaimed and alleged that Commercial Painting had breached the subcontract by delaying the project and performing defective work. Weitz sought damages of $500,000, interest, and attorney's fees.

A jury trial was held in September and October 2018. As relevant here, the jury returned verdicts in favor of Commercial Painting on its breach of contract, intentional misrepresentation, and unjust enrichment claims against Weitz and further found that Commercial Painting was entitled to pre-judgment interest and punitive damages. The trial court approved the verdict and awarded Commercial Painting $1,729,122 in compensatory

---

[1] Weitz's sureties—Federal Insurance Company and St. Paul Fire & Marine Insurance Company—were among those defendants. They are also appellants in this case.

[2] As explained in more detail by the majority opinion, this case has a lengthy procedural history that included two appeals before this one. Those appeals preceded the filing of Commercial Painting's second amended complaint in 2017. *See Com. Painting Co. v. Weitz Co.*, No. W2019-02089-COA-R3-CV, 2022 WL 737468, at *1–4 (Tenn. Ct. App. Mar. 11, 2022).

damages plus pre-judgment interest, $3,900,000 in punitive damages, and $1,103,549 in attorney's fees.[3]

The Court of Appeals affirmed in part, reversed in part, and vacated in part. *See Com. Painting Co. v. Weitz Co.*, No. W2019-02089-COA-R3-CV, 2022 WL 737468, at *1 (Tenn. Ct. App. Mar. 11, 2022). The court affirmed the award of compensatory damages. *Id.* at *29. But it reversed the punitive damages and pre-judgment interest awards. The court concluded that the economic-loss doctrine precluded Commercial Painting from recovering tort damages and that Commercial Painting was limited to remedies under the subcontract, which did not allow for punitive damages or pre-judgment interest. *Id.* at *30. Finally, the court vacated the attorney's fees award and remanded the case to the trial court to determine the amount of attorney's fees incurred exclusively in obtaining the compensatory damages award. *Id.* at *31. The court denied Commercial Painting's request for attorney's fees on appeal, reasoning that Weitz was the "prevailing party" on appeal because it had "obtain[ed] reversal of a significant portion of the damages awarded by the jury." *Id.*

We granted Commercial Painting's application for permission to appeal. We instructed the parties to address two issues: first, whether the Court of Appeals erred by expanding the application of the economic-loss doctrine to the circumstances of this case; and second, whether the Court of Appeals erred in vacating the trial court's award of attorney's fees and in limiting the scope of recoverable fees on remand, and whether the Court of Appeals erred in denying Commercial Painting costs and fees on appeal.

II.

The majority holds that the economic-loss doctrine does not apply outside the products liability context and upholds a jury verdict awarding Commercial Painting nearly $4 million in punitive damages. I would instead conclude that the economic-loss doctrine precludes Commercial Painting from recovering tort damages and affirm the Court of Appeals' judgment reversing the award of punitive damages and pre-judgment interest. I begin with an overview of the economic-loss doctrine. I then explain why the doctrine should apply in cases involving contracts for services. Finally, I address the majority's contention that extending the doctrine would cause too much confusion.

A.

The term "economic-loss doctrine" or "economic-loss rule" is a bit of a misnomer because it suggests a single rule that is uniformly and consistently applied. *See* Dan B. Dobbs et al., *Dobbs' Law of Torts* § 607, Westlaw (database updated May 2023) ("[T]he

---

[3] The compensatory damages award was later reduced to $1,272,952.46 to account for an extrajudicial payment.

- 4 -

implication of references to 'the' economic loss rule that there is but a single overarching economic loss rule is misleading."). In fact, the doctrine is a collection of "'somewhat similar doctrines that tend to limit liability' but work in different ways in different contexts, for not necessarily identical reasons." *Milan Supply Chain Sols., Inc. v. Navistar, Inc.*, 627 S.W.3d 125, 145 (Tenn. 2021) (quoting Oscar S. Gray, *Some Thoughts on "The Economic Loss Rule" and Apportionment*, 48 Ariz. L. Rev. 897, 898 (2006)); *see also* Jay M. Feinman, *The Economic Loss Rule and Private Ordering*, 48 Ariz. L. Rev. 813, 813 (2006) ("Because the rule applies to a diverse range of situations, there is not one economic loss rule, but several."). In its broadest form, the doctrine precludes recovery in tort for harm that is purely economic. *See* Vincent R. Johnson, *The Boundary-Line Function of the Economic Loss Rule*, 66 Wash. & Lee. L. Rev. 523, 525 (2009). But most courts apply a narrower version of the rule that prohibits tort liability for purely economic losses only in certain circumstances. *See id.*

What we now call the economic-loss doctrine originated in products liability cases in the 1960s. As one commentator has noted, "[t]he economic loss rule was not formally stated" before then, but "only because it was not needed." Feinman, *supra*, at 815; *see also Milan*, 627 S.W.3d at 142 n.15. "At the outset of the twentieth century, product defect claims were squarely within the province of contract law—one could only recover if in privity of contract with the product seller, and only in accordance with the specific provisions and limitations of contract." Catherine M. Sharkey, *The Remains of the Citadel (Economic Loss Rule in Products Cases)*, 100 Minn. L. Rev. 1845, 1845 (2016). By the 1960s, however, "an injured consumer not in privity with the manufacturer could often successfully sue using both a breach of contract (implied warranty) theory and a tort theory (either negligence or strict liability)." *Id.* at 1846.

The California Supreme Court was the first to apply a form of the economic-loss doctrine. *See Seely v. White Motor Co.*, 403 P.2d 145 (Cal. 1965). In *Seely*, the court rejected the contention that strict liability should displace the law of warranty in cases involving economic losses. The court explained that "[t]he distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary" but rather "rests . . . on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products." *Id.* at 151. On the one hand, a manufacturer "can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm." *Id.* On the other hand, he "cannot be held [liable] for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands." *Id.* The court noted that applying "the rules of warranty" instead of strict liability helped prevent manufacturers from being held "liable for damages of unknown and unlimited scope." *Id.* at 150–51.

Twenty years later, the United States Supreme Court adopted *Seely*'s approach and held that "a manufacturer in a commercial relationship has no duty under either a

negligence or strict products-liability theory to prevent a product from injuring itself." *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 871 (1986). In the Court's view, the "reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong." *Id.* The Court explained that "[c]ontract law, and the law of warranty in particular, is well suited to commercial controversies . . . because the parties may set the terms of their own agreements." *Id.* at 872–73. The Court saw "no reason to intrude into the parties' allocation of the risk," and it echoed *Seely*'s concern that "[p]ermitting recovery for all foreseeable claims for purely economic loss could make a manufacturer liable for vast sums." *Id.* at 874. Allowing products liability to encroach too far on the law of warranty, the Court explained, would cause "contract law [to] drown in a sea of tort." *Id.* at 866.

Our Court, too, originally adopted the economic-loss doctrine in products liability cases for reasons similar to those underlying the *Seely* and *East River* decisions. *See Ritter v. Custom Chemicides, Inc.*, 912 S.W.2d 128, 132–33 (Tenn. 1995) (implicitly applying doctrine to bar negligent-misrepresentation claim by farmers alleging that chemical product that was intended to protect crops from frost was defective); *Lincoln General Ins. Co. v. Detroit Diesel Corp.*, 293 S.W.3d 487, 491–92 (Tenn. 2009) (expressly adopting the doctrine in products liability case against a bus manufacturer); *see also Milan*, 627 S.W.3d at 153 (applying doctrine in a products liability case and noting that "this Court has never applied" the doctrine outside that context).

In *Lincoln General*, we explained that "the remedies available to" the owners of a defective product "should derive from the parties' agreements, not from the law of torts, lest we disrupt the parties' allocation of risk." 293 S.W.3d at 491. We reasoned that a contrary holding "would make it more difficult for parties to predict the consequences of their business transactions, the cost of which ultimately falls on consumers in the form of increased prices." *Id.* We ultimately adopted the *East River* approach because it "fairly balances the competing policy interests and clearly delineates between the law of contract and the law of tort." *Id.* at 492.

Our more recent decision in *Milan* likewise underscored the need to protect parties' freedom to contract and "preserv[e] the boundary line between tort and contract law." 627 S.W.3d at 155. We declined to adopt a broad fraud exception to the economic-loss doctrine because doing so would undermine the parties' contractual bargain "by importing tort remedies into the deal." *Id.* (quoting *HealthBanc Int'l, LLC v. Synergy Worldwide, Inc.*, 435 P.3d 193, 197–98 (Utah 2018)).

Although the economic-loss doctrine originated in products liability cases, at least thirteen jurisdictions—Arizona, Colorado, Hawaii, Idaho, Illinois, Indiana, Nevada, Texas, Utah, Vermont, Virginia, Washington, and Wyoming—have extended it to cases involving other contractual relationships, including contracts for services. *See Flagstaff Affordable Hous. Ltd. P'ship v. Design All., Inc.*, 223 P.3d 664, 665 (Ariz. 2010) (applying doctrine

to contract for architectural design services); *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 67–68 (Colo. 2004) (applying doctrine to contract for bridge design and construction); *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1264–66 (Colo. 2000) (applying doctrine to contract for installation of a water system); *City Express, Inc. v. Express Partners*, 959 P.2d 836, 839–40 (Haw. 1998) (applying doctrine to contract for architectural services); *Brian & Christie, Inc. v. Leishman Elec., Inc.*, 244 P.3d 166, 170 (Idaho 2010) ("The economic loss rule applies to negligence cases in general; its application is not restricted to products liability cases.") (quoting *Ramerth v. Hart*, 983 P.2d 848, 851 (Idaho 1999))); *Fireman's Fund Ins. Co. v. SEC Donohue, Inc.*, 679 N.E.2d 1197, 1200–01 (Ill. 1997) (applying doctrine to contract for engineering services); *Anderson Elec., Inc. v. Ledbetter Erection Corp.*, 503 N.E.2d 246, 249 (1986) (applying doctrine to contract for electrical services); *Indianapolis-Marion Cnty. Pub. Libr. v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 742 (Ind. 2010) (applying doctrine to contracts for construction design and inspection services); *Gunkel v. Renovations, Inc.*, 822 N.E.2d 150, 153 (Ind. 2005) ("[D]amage from a defective product *or service* may be recoverable under a tort theory if the defect causes personal injury or damage to other property, but contract law governs damage to the product *or service* itself and purely economic loss arising from the failure of the product *or service* to perform as expected." (emphasis added)); *Terracon Consultants W., Inc. v. Mandalay Resort Grp.*, 206 P.3d 81, 89 (Nev. 2009) (applying doctrine to contracts for architectural and engineering services); *LAN/STV v. Martin K. Eby Constr. Co.*, 435 S.W.3d 234, 245–46 (Tex. 2014) (applying doctrine to contract for architectural services); *Hayes v. Intermountain GeoEnvironmental Servs., Inc.*, 498 P.3d 435, 439–43 (Utah 2021) (applying doctrine to contract for engineering services); *Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 221 P.3d 234, 244, 249 (Utah 2009) (applying doctrine to construction contracts); *SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.*, 28 P.3d 669, 681–82 (Utah 2001) (applying doctrine to contract for architectural services); *Springfield Hydroelectric Co. v. Copp*, 779 A.2d 67, 71 (Vt. 2001) ("The economic loss rule clearly applies to commercial disputes outside the confines of product liability . . . ."); *Long Trail House Condo. Ass'n v. Engelberth Constr., Inc.*, 59 A.3d 752, 755–61 (Vt. 2012) (applying doctrine to construction contract); *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004) (applying doctrine to contract to procure homeowners' insurance); *Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1*, 881 P.2d 986, 992 (Wash. 1994) (applying doctrine to contract for architectural services); *Excel Constr., Inc. v. HKM Eng'g, Inc.*, 228 P.3d 40, 45–46 (Wyo. 2010) (applying doctrine to contracts for engineering and design services); *Rissler & McMurry Co. v. Sheridan Area Water Supply Joint Powers Bd.*, 929 P.2d 1228, 1235 (Wyo. 1996) (applying doctrine to contract for engineering services).

These courts have reasoned that applying the economic-loss doctrine to services contracts furthers the rationales underlying the doctrine by protecting parties' ability to allocate risks and responsibilities by contract. As the Illinois Supreme Court put it, "[t]he policy interest supporting the ability to comprehensively define a relationship in a service

contract parallels the policy interest supporting the ability to comprehensively define a relationship in a contract for the sale of goods." *Congregation of the Passion v. Touche Ross & Co.*, 636 N.E.2d 503, 514 (Ill. 1994); *see also Indianapolis-Marion Cnty. Pub. Libr.*, 929 N.E.2d at 742 ("[T]he policy justifications for the economic loss rule discussed throughout this opinion amply support applying the rule to products and services alike."). The Indiana Supreme Court acknowledged that the Uniform Commercial Code ("UCC") "does not apply to service contracts," but it found that distinction immaterial because "the common law of contracts has well developed rules of interpretation and doctrines to protect the reasonable expectations of the parties." *Indianapolis-Marion Cnty. Pub. Libr.*, 929 N.E.2d at 742.

Some of these courts have extended the doctrine to cases involving contracts for services in the construction context, without indicating whether they would apply the doctrine to contracts for other kinds of services. These courts have pointed out that the policy rationales for the doctrine apply especially strongly in the construction context. *See, e.g.*, *Flagstaff Affordable Hous.*, 223 P.3d at 669 (reasoning that "[t]he contract law policy of upholding the expectations of the parties has as much, if not greater, force in construction defect cases as in product defect cases"); *Terracon Consultants*, 206 P.3d at 90 ("The work provided by construction contractors or the services rendered by design professionals in the commercial building process are both integral to the building process and impact the quality of building projects. Therefore, when the quality is deemed defective, resulting in economic loss, remedies are properly addressed through contract law."); *City Express*, 959 P.2d at 840 ("Construction projects are characterized by detailed and comprehensive contracts that form the foundation of the industry's operations. Contracting parties are free to adjust their respective obligations to satisfy their mutual expectations." (quoting *Am. Towers Owners Ass'n v. CCI Mech. Inc.*, 930 P.2d 1182, 1190 (Utah 1996))); *Davencourt at Pilgrims Landing*, 221 P.3d at 242 (stating that the economic-loss doctrine is "particularly applicable to claims of negligent construction based on the construction industry's use of detailed and comprehensive contracts that form obligations and expectations" (internal quotation marks omitted)); *Berschauer/Phillips Constr.*, 881 P.2d at 992 ("We hold parties to their contracts. If tort and contract remedies were allowed to overlap, certainty and predictability in allocating risk would decrease and impede future business activity. The construction industry in particular would suffer, for it is in this industry that we see most clearly the importance of the precise allocation of risk as secured by contract."); *Excel Constr.*, 228 P.3d at 45 ("The Court continues to believe that parties to a construction contract have the opportunity to allocate the economic risks associated with the work, and that they do not need the special protections of tort law to shield them from losses arising from risks . . . which are inherent in performance of the contract.").

Supreme courts in only three jurisdictions—Minnesota, Wisconsin, and Florida—have declined to apply the economic-loss doctrine in cases involving services contracts. *See McCarthy Well Co., Inc. v. St. Peter Creamery, Inc.*, 410 N.W.2d 312, 314–15 (Minn.

1987); *Ins. Co. of N. Am. v. Cease Elec. Inc.*, 688 N.W.2d 462, 467–72 (Wis. 2004); *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*, 110 So. 3d 399, 406–07 (Fla. 2013).

Both the Minnesota Supreme Court and the Wisconsin Supreme Court distinguished contracts for services on the ground that, unlike contracts for goods, such contracts are not governed by the UCC. In *McCarthy*, the Minnesota Supreme Court explained that the economic-loss doctrine is "premised on the existence of certain rights and remedies provided for in the [UCC]" and the notion that "allow[ing] tort liability in commercial transactions would totally emasculate [the warranty and liability] provisions of the [UCC]." 410 N.W.2d at 314 (second alteration in original) (internal quotation marks omitted). Similarly, in *Cease*, the Wisconsin Supreme Court noted that "the existence of [certain] rights and remedies" under the UCC is "one of the critical rationales underlying the economic loss doctrine." 688 N.W.2d at 469. "[I]f a commercial purchaser were allowed to sue in tort to recover solely economic loss," the court explained, the UCC "provisions designed to govern such disputes could be circumvented entirely," *id.*, and "contract law would drown in a sea of tort," *id.* (quoting *E. River*, 476 U.S. at 874). *Cease* concluded that the same rationale does not apply to services contracts, because "[u]nlike contracts for products or goods, which enjoy the benefit of well-developed law under the [UCC], no such benefit exists for contracts for services." *Id.*

The *Cease* court also reasoned that extending the economic-loss doctrine to services contracts would do little to further the policy rationales underlying the doctrine. The court noted that contracts for services are often "simple and informal" and do not necessarily reflect the "fundamental premise" that "bargaining parties will allocate the risks and remedies." *Id.* at 470. The court also worried that extending the doctrine would put the court "on a slippery slope of having to decide whether an exception should be made for some or all professional groups" such as lawyers and accountants. *Id.* at 471.

The Florida Supreme Court initially applied the economic-loss doctrine to services contracts while carving out exceptions for professional services and tort claims that were independent of any breach of contract. *See AFM Corp. v. S. Bell Tel. & Tel. Co.*, 515 So. 2d 180, 181–82 (Fla. 1987) (extending economic-loss doctrine to contract for advertising services); *Moransais v. Heathman*, 744 So. 2d 973, 983 (Fla. 1999) (declining to apply doctrine to contracts for professional services); *Indem. Ins. Co. of N. Am. v. Am. Aviation, Inc.*, 891 So. 2d 532, 542–43 (Fla. 2004) (declining to apply economic-loss doctrine where parties were not in privity, but affirming other exceptions).

In *Tiara*, however, a deeply divided court reversed course, overruled earlier precedents, and limited the economic-loss doctrine to products liability cases. 110 So. 3d at 400. The majority concluded that applying the doctrine to contracts for services did not further its original purpose, which was "to protect manufacturers from liability for economic damages caused by a defective product beyond those damages provided by warranty law." *Id.* at 403. The majority's "experience with the economic loss rule over

time, which led to the creation of the exceptions to the rule," had demonstrated "that expansion of the rule beyond its origins was unwise and unworkable in practice." *Id.* at 407. Other than pointing to the court's creation of various exceptions to the doctrine, however, the majority did not explain in what way extension of the doctrine had proved unworkable.

Justice Pariente, joined by two other Justices, concurred in the majority opinion but wrote separately to explain that the decision to limit the economic-loss doctrine to the products liability context "does not undermine Florida's contract law or provide for an expansion in viable tort claims." *Id.* at 408 (Pariente, J., concurring). That was because "[b]asic common law principles already restrict the remedies available to parties who have specifically negotiated for those remedies." *Id.* "[T]o bring a valid tort claim," for example, a party must satisfy "all of the required elements for the cause of action," including that "the tort is independent of any breach of contract claim." *Id.* The concurrence acknowledged that the economic-loss doctrine "has provided a simple way to dismiss tort claims interconnected with breach of contract claims" but found it "neither a necessary nor a principled mechanism for doing so" because "basic contractual principles" accomplish the same result. *Id.* at 409. In the concurrence's view, common-law contract principles already "properly delineate the general boundary between contract law and tort law." *Id.* And "[a]pplication of the economic loss rule to serve this function outside the products liability context simply allows for the possibility of confusion, overuse, and the restriction of well-established common law remedies." *Id.*

Justice Polston dissented and accused the majority of "greatly expand[ing] the use of tort law at a cost to Florida's contract law." *Id.* at 410 (Polston, J., dissenting). Justice Canady dissented as well, likewise contending that the majority was expanding "tort law at the expense of contract law." *Id.* at 411 (Canady, J., dissenting). In his view, "[t]he goal of preventing contract law from drowning in a sea of tort is as compelling in the broader context of contract-based relationships as it is in the product liability context." *Id.* at 413. And "[t]he fact that the economic loss rule is subject to certain recognized exceptions— exceptions that are based on specific policy considerations—does not undermine the integrity of the general rule or obliterate the purpose on which it is based." *Id.*

B.

Unlike the majority, I would join those courts that have extended the economic-loss doctrine to contracts for services. I reach this conclusion for two primary reasons.

*First*, applying the economic-loss doctrine to contracts for services directly furthers its "central purpose of preserving the boundary line between tort and contract law." *Milan*, 627 S.W.3d at 155. Early cases adopting the economic-loss doctrine reflected several different policy rationales, including the need to prevent unbounded and unpredictable liability, the superiority of warranty law in addressing product defects, and the preference for private allocation of risk. *See, e.g.*, Johnson, *supra*, at 542–47. Today, however, it is

widely accepted that the principal and strongest rationale for the economic-loss rule is its "critical boundary-line function, separating the law of torts from the law of contracts." *Id.* at 546; *see also* Feinman, *supra*, at 817 ("As expressed in the case law and the literature, the principal explanation for the rise of the economic loss rule . . . is the preference for private ordering over public regulation."); Dobbs, *supra*, at § 614 ("Perhaps the strongest [rationale for the economic-loss doctrine] is to honor the contract by enforcing its express or implied allocations of responsibility."). By limiting parties to their remedies under the contract, the economic-loss doctrine respects and encourages private ordering, which does a better job of furthering individual and societal interests than tort law. *See* Johnson, *supra*, at 548, 580 (explaining that the boundary-line function of the doctrine ensures that "the adjudication of tort remedies defers to private ordering"); Feinman*, supra*, at 817 (attributing the economic-loss rule to "a belief that there is a meaningful distinction between contract law and tort law, and that in cases of potential overlap, contract law is a superior system for regulating behavior and achieving socially optimal results").

Application of the economic-loss doctrine to contracts for services, no less than contracts for the purchase of goods, directly furthers this rationale. Contracts for services, like contracts for goods, allow parties to "allocate[] the risks and benefits of performance." Feinman, *supra*, at 814. As with contracts for goods, the court "upsets that allocation when it imposes liability . . . outside the contract" and "undermines the process of contracting." *Id.*; *see also* Dobbs, *supra*, at § 614 ("[I]f the contract limits liability, the rule eliminating tort claims prevents the plaintiff from circumventing the contract's allocation of loss."). This is true even when a contract is "simple and informal." *Cease*, 688 N.W.2d at 470. And it is especially true in the construction industry, where "detailed and comprehensive contracts" are routinely used to establish obligations and expectations. *City Express*, 959 P.2d at 840 (quoting *Am. Towers*, 930 P.2d at 1190); *see also Davencourt at Pilgrims Landing*, 221 P.3d at 242–43 (same).

The majority posits that "[o]ne party need not have to consider another party's fraud among the potential risks and costs when negotiating a contract in good faith." But the majority's decision to cabin the economic-loss doctrine is not limited to fraud claims. By altogether refusing to extend the economic-loss doctrine to contracts for services, the majority opinion opens the door to any and all tort claims, including those alleging nothing more than negligent performance of the contract. In any event, the Court already considered in *Milan* whether fraud justifies interfering with the freedom of contract. 627 S.W.3d at 154. And it held that, "[w]hen the alleged fraud concerns pre-contractual misrepresentations and nondisclosures" about matters "that are the subject of a contract between sophisticated business entities, Tennessee's interest in freedom of contract prevails, and the economic loss doctrine applies." *Id.* Tennessee's interest in the freedom of contract should prevail here too.

The majority also suggests that the doctrine's boundary-line function is stronger in products liability cases than the services context because the UCC ensures that a contract-

law remedy is readily available. It may be that the doctrine's "boundary-line function . . . is most clearly established in the field of products liability." Johnson, *supra*, at 549. But that does not mean the function is absent in other contractual contexts. To the contrary, Professor Johnson acknowledges that the "purpose of the economic loss rule is . . . to ensure respect for private ordering by relegating a plaintiff to contract remedies in cases where there is an agreement between the parties allocating economic risks." *Id.* at 555. That purpose is served when the economic-loss doctrine is applied to claims between parties to any contractual agreement, regardless of its subject matter.

This case does not require us to extend the economic-loss doctrine to claims between parties lacking contractual privity or other situations in which it could be said that the boundary-line function of the doctrine is less directly implicated. *See, e.g.*, Johnson, *supra*, at 553, 555 (noting that "[a] number of courts have rejected arguments that contract principles define the extent of a duty where the economic injurer and victim were not in privity" and arguing that "decisions holding that third-party claims are not foreclosed by the [economic-loss] rule make sense" in light of the rule's boundary-line function). Whether to extend the doctrine in those situations presents a more difficult question. This case merely asks us to treat contracts for services the same as contracts for goods. Because I see no good reason to distinguish between the two, I would hold that the economic-loss doctrine applies here.

*Second*, unlike the majority, I am not convinced that existing limiting principles in Tennessee's common law will provide sufficient "safeguards against disproportionate liability." The majority notes that the law "already precludes double or excessive recovery for the same damages." True enough. But "tort law frequently offers potential plaintiffs more generous terms of recovery" than contract remedies. Johnson, *supra*, at 549. As one example, "punitive damages and attorney fees are sometimes available in tort actions, but generally cannot be had in breach of contract claims." *Grams v. Milk Prods., Inc.*, 699 N.W.2d 167, 171, 171 n. 4 (Wis. 2005) (noting that "[t]ort law generally offers a 'broader array' of damages than contract" (quoting *Cease*, 688 N.W.2d at 467)). That means that even if a plaintiff is precluded from recovering overlapping damages in both contract and tort, tort damages often will far exceed contract damages. This case proves the point: Commercial Painting's tort claim resulted in a punitive damages award of nearly $4 million—damages that would have been unavailable had Commercial Painting been limited to its contract remedies. *See Com. Painting*, 2022 WL 737468, at *28.

The majority also trusts that "concepts[] such as foreseeability and proximate causation" will prove sufficient. Properly applied, principles governing foreseeability and proximate causation will likely provide some protection from excessive tort liability. But that protection will depend on the facts of each case and will not afford contracting parties nearly the same certainty or predictability as the economic-loss doctrine. *See Lincoln General*, 293 S.W.3d at 489 (describing the economic-loss doctrine as a "bright-line rule").

The common-law principle that holds the most promise as a potential limiting force is one the majority fails to mention: the independent-duty rule. That rule "is closely related to the economic loss rule" and provides that "[a] tort action only arises when the act constituting the contract breach also constitutes a breach of a common law duty *independent* of the contractual relationship." *Com. Painting*, 2022 WL 737468, at *12 (quoting *E Sols. for Bldgs., LLC v. Knestrick Contractor, Inc.*, No. M2018-02028-COA-R3-CV, 2019 WL 5607473, at *9 (Tenn. Ct. App. Oct. 30, 2019)); *see also Tiara*, 110 So. 3d at 408 (Pariente, J., concurring) (pointing to the independent-duty rule in concluding that "common law principles [of contract] already restrict the remedies available to parties who have specifically negotiated for those remedies").[4] But our Court has yet to expressly adopt the independent-duty rule. It therefore remains unclear whether that rule will adequately protect contracting parties.

In sum, I would extend the economic-loss doctrine to contracts for services because there is no principled basis to distinguish those contracts from contracts for the purchase of goods and because existing common-law principles are not an adequate substitute for application of the doctrine.

C.

The majority's strongest objection to extending the economic-loss doctrine to contracts for services is that doing so would "necessitate[] finding and justifying very numerous and confusing exceptions." To be sure, some exceptions may be necessary. But I do not find those exceptions as confusing as the majority, and certainly no more confusing than exceptions that exist in countless other areas of the law.

Most of the exceptions that exist in jurisdictions that have extended the economic-loss doctrine to contracts for services are simply the flipside of the independent-duty rule: When a claim is premised on a common-law duty that is independent of the contractual relationship, the economic-loss doctrine will not bar the claim. *See, e.g.*, *Hermansen v. Tasulis*, 48 P.3d 235, 240 (Utah 2002) ("[T]he initial inquiry in cases where the line between contract and tort blurs is whether a duty exists independent of any contractual obligations between the parties."); *Town of Alma*, 10 P.3d at 1262 (explaining that a tort action premised on breach of a duty that arises independently of the parties' contractual duties remains viable); *Springfield Hydroelectric Co.*, 779 A.2d at 71 ("The underlying analysis turns on whether there is 'a duty of care *independent* of any contractual obligations.'" (quoting *Grynberg v. Agri Tech, Inc.*, 10 P.3d 1267, 1269 (Colo. 2000))); *Congregation of the Passion*, 636 N.E.2d at 514 (holding that the economic-loss doctrine does not prohibit tort recovery for breach of a duty arising outside the contract).

---

[4] Weitz argued to the Court of Appeals that the independent-duty rule precluded Commercial Painting's tort claims, but the Court of Appeals held that Weitz had waived that argument by failing to preserve it in the trial court. *See Com. Painting*, 2022 WL 737468, at *12–13.

It is on this basis that courts have excepted from the economic-loss doctrine claims against certain professionals such as attorneys and physicians. *See, e.g.*, *Davencourt at Pilgrims Landing*, 221 P.3d at 247 (citing the attorney-client relationship as an example of an independent duty of care); *S K Peightal Eng'rs, LTD v. Mid Valley Real Est. Sols. V, LLC*, 342 P.3d 868, 875 (Colo. 2015) (explaining that certain "special relationships" such as the attorney-client relationship and physician-patient relationship "automatically trigger independent duties of care" (quoting *Grynberg*, 10 P.3d at 1271)). Courts' approaches to determining exactly which claims fall into this "independent duty" category have varied. But nothing prevents us from adopting the approach we deem best or developing an approach of our own.

The other notable category of exceptions includes claims alleging intentional torts and negligent misrepresentation. Again, courts' approaches to these exceptions have varied. *See, e.g.*, *Milan*, 627 S.W.3d at 146 (explaining that "[a]t least three approaches have emerged" regarding application of the economic-loss doctrine to fraud claims). But we have already grappled with these exceptions in products liability cases, *see id.* at 153–54 (adopting middle-ground approach to fraud claims), and could apply the same approach in cases involving contracts for services.

Finally, the majority's decision to cabin the economic-loss doctrine to products liability cases is likely to create confusion of its own. In other jurisdictions that have declined to extend the economic-loss doctrine to contracts for services, courts soon faced questions about contracts for items that are neither clearly goods nor clearly services and hybrid contracts involving both goods and services. In *Linden v. Cascade Stone Co.*, for example, the Wisconsin Supreme Court adopted "the predominant purpose test to determine whether a mixed contract for products and services is predominately a sale of a product and therefore subject to the economic loss doctrine or predominately a contract for services and therefore not subject to the economic loss doctrine." 699 N.W.2d 189, 193 (Wis. 2005) (citations omitted). Applying that test to a contract for the construction of a home, the court held that the economic-loss doctrine applied because the homeowners had "bargained for [a] finished product, a house; not its various components." *Id.* at 198. That decision has been subject to criticism, however, because "a residential real estate transaction is not a contract for a product, and residential real estate transactions are protected by neither manufacturer warranties nor the U.C.C." *Below v. Norton*, 751 N.W.2d 351, 366 (Wis. 2008) (Bradley, J., dissenting). Minnesota adopted a similar predominant-purpose test for hybrid contracts, but its application has yielded inconsistent answers. The Minnesota Supreme Court declined to apply the economic-loss doctrine to a contract for well-restoration services and installation of a new pump after determining that it was primarily a contract for services. *McCarthy*, 410 N.W.2d at 315. The following year, by contrast, the Minnesota Court of Appeals applied the economic-loss doctrine to a contract for the sale, assembly, and installation of a silo after determining that it was primarily a

contract for goods. *Holstad v. Sw. Porcelain, Inc.*, 421 N.W.2d 371, 373–75 (Minn. Ct. App. 1988).

Given that some confusion is inevitable whichever path we take, I would choose the path that furthers the important interests underlying the economic-loss doctrine and join those jurisdictions that have extended the doctrine to contracts for services.

_____

SARAH K. CAMPBELL, JUSTICE